**FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
* AUGUST 20, 2025 *
BROOKLYN OFFICE**

JOHN STEBE, ESQ.
3514 Campfire Rd.
Yorktown Heights, NY 10598
Tel (718) 490-7130
Email: StebeLaw@yahoo.com

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

```
-------------------------------------------------------------x
VADIM PAVLOTSKIY,                           :
                                            :
                    Petitioner-Plaintiff    :
                                            :
        - vs -                              :
                                            :
WILLIAM JOYCE, Acting Field Office          :
Director of the New York Immigration and    :
Customs Enforcement Office,                  :
                                            :
TODD LYONS, Acting Director of United       :
States Immigration and Customs Enforcement, :
                                            :
KRISTI NOEM, Secretary of the United        :
States Department of Homeland Security,      :
                                            :
PAM BONDI, Attorney General of the United   :
States,                                     :
                                            :
                    Respondents-Defendants. :
-------------------------------------------------------------x
```

**PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Docket No.: **25-CV-4622**

**Judge Hector Gonzalez**

### PRELIMINARY STATEMENT

1. Petitioner-Plaintiff Vadim Pavlotskiy, by his attorney John P. Stebe, Esq., respectfully submits the foregoing Petition for Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief to prevent the United States Department of Homeland Security and United States Immigration and Customs Enforcement from detaining him unless and until his removal is foreseeable, and without first providing him a due process hearing where the Government bears

the burden to demonstrate to a neutral adjudicator that he is a danger to the community or flight risk by clear and convincing evidence.

2. Upon information and belief, Mr. Pavlotskiy has never been ordered to be removed to a third country or notified of such potential removal. In light of the United States Supreme Court decision in U.S. Department of Homeland Security, et al. v. D.V.D., et al., No. 24A1153, 2025 WL 1732103 (June 23, 2025), which stayed the nationwide injunction that had precluded Respondents from removing noncitizens to third countries without notice and an opportunity to seek fear-based relief, ICE appears emboldened and intent to implement its campaign to send noncitizens to far corners of the planet, places they have absolutely no connection to whatsoever, in violation of clear statutory obligations set forth in the Immigration & Nationality Act ("INA"), binding treaty, and due process. In the absence of the nationwide Injunction, individual lawsuits like the instant case are the only method to challenge the improper third-country removals.

3. Mr. Pavlotskiy is a Stateless person under an Order of Supervision to which he consented in 2008.

4. Mr. Pavlotskiy arrived in the United States as a Jewish Refugee in 1991 fleeing communist regime of the Soviet Union (USSR) under the Jackson-Vanik Amendment approved by Congress in 1974.

5. In 1998, Mr. Pavlotskiy pleaded guilty to 2 felony counts in the USDC EDNY and was found guilty of another felony after a trial. He was sentenced to 101 months in prison. Upon completion of his sentence, Mr. Pavlotskiy was transferred to an Immigration Detention Facility where he remained for a period of 109 days [Judgement of Conviction annexed as Exhibit A].

6. At that time, he consented to removal and submitted request for his acceptable to the USSR's successor county [Ukraine].

7. Ukraine denied his application indicating that he was never a Ukrainian citizen and that they will not accept him. Two other countries also denied his request [Letter from Ukraine rejecting Mr. Pavlotskiy's application for travel document is annexed as Exhibit B].

8. Having found that his removal is not feasible or foreseeable, U.S. Immigration and Customs Enforcement (ICE) released him with an Order of Supervision, which requires the Petitioner-Plaintiff to check in with ICE on certain dates.

9. Since 2008 [when he was released] until today, Mr. Pavlotskiy has not missed a single check in and has complied with all ICE requirements.

10. It is noteworthy, that even though he was born in the land known now as Ukraine, he was never afforded citizenship of that country, and when he left, no such country existed.

11. Over the last 16 years in which he has lived in liberty, he has been a primary caretaker to his parents, his wife, and three stepchildren. Two of those children require special care and have special needs. They were diagnosed with various psychiatric and psychological illnesses [Affidavits from Mr. Pavlotskiy's spouse and parents are annexed as Exhibit C and D].

12. Mr. Pavlotskiy himself was hospitalized several times for heart-related issues and other medical conditions [Copies of the key excerpts from his medical records are annexed as Exhibit E]. He maintains and pays in full for health insurance which covers all his costs.

13. He has applied and was granted a Work Authorization in accordance with 8 C.F.R. §241.5.

14. Mr. Pavlotskiy's wife [Zhannetta Pavlotskiy], who is a U.S. Citizen, is a Registered Nurse, currently in school to become a Nurse Practitioner.

15. Mr. Pavlotskiy runs a business with his partner [Guardian Risk Management Consultants LLC], which has 200 employees.

16. Numerous credible reports demonstrate that across the country including the New York area, individuals under the Order of Supervision are being called in for check-in and then arrested without an actual country for removal identified or confirmed.

17. The Rapid Response Network, a immigrant watch group reports that immigrants in cases such as the Petitioner-Plaintiff herein and other similarly situated are being called in for check-in at ISAP (Intensive Supervision Appearance Program) for what is usually a routine appointment and are then detained for an indefinite period of time without prospect of removal.

18. In recent months, ICE has engaged in highly publicized arrests of individuals who presented no flight risk or danger, often with no prior notice that anything regarding their status was amiss or problematic, whisking them away to faraway detention centers without warning.

19. In light of credible reports of ICE re-incarcerating individuals at their check-ins, there is a strong likelihood that Mr. Pavlotskiy will be arrested and detained at this appointment, even though he poses no flight risk, presents no danger to the community, and his removal is not reasonably foreseeable. If he is arrested, he faces the very real possibility of being transferred outside New York with little or no notice, far away from his U.S. Citizen spouse, his U.S. citizen children, his U.S. Citizen elderly parents, his business, his community, and his attorney.

20. The only legitimate (and constitutional) justifications for immigration detention are danger and flight risk, see: Zadvydas v. Davis, 533 U.S. 678, 690 (2001), but the immigrants who show up are taken from ISAP to a holding area on the 10th Floor of the Federal Building at 26 Federal Plaza for processing and apparently to be taken to a detention center across the country[1].

---

[1] "ICE arrests 15 people, including 3-year-old child, in San Francisco, advocates say," San Francisco Chronicle (June 5, 2025), https://www.sfchronicle.com/bayarea/article/ice-arrests-sf-immigration-trump-20362755.php; "Cincinnati high school graduate faces deportation after routine ICE check-in," ABC News (June 9, 2025), https://abcnews.go.com/US/cincinnati-high-school-graduate-faces-deportation-afterroutine/story?id=122652262. https://www.nytimes.com/video/us/politics/100000010054472/mahmoud-khalils-arrest.html (Mahmoud Khalil, arrested in New York and transferred to Louisiana); "What we know about the Tufts University PhD student detained by federal agents," CNN (Mar. 28, 2025), https://www.cnn.com/2025/03/27/us/rumeysa-ozturk-detained-what-we-

21. Mr. Pavlotskiy, attended each and every check-in as required, and was always determined to be neither a danger to the community nor a flight risk, see: 8 C.F.R. § 1236(c)(8) ("Any [authorized] officer … may … release [a noncitizen] not described in section 236(c)(1) of the Act provided that the [noncitizen] must demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the [noncitizen] is likely to appear for any future proceeding."); see also: e.g., Saravia v. Sessions, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017), aff'd sub nom. Saravia for A.H. v. Sessions, 905 F.3d 1137 (9th Cir. 2018) ("Release reflects a determination by the government that the noncitizen is not a danger to the community or a flight risk.").

22. Nothing about Mr. Pavlotskiy's circumstances changed between the government's initial determination sixteen years ago and his upcoming ICE check in to justify re-detention. On the contrary, Mr. Pavlotskiy's conduct in the past sixteen years – his full compliance with supervision requirements, his appearance at all of his ICE check in appointments, his commitment to his spouse and children, parents, and his community ties – only further confirm the government's conclusion that he is not a danger or flight risk. This basic principle—that individuals placed at liberty are entitled to process before the government imprisons them—has particular force here, where Mr. Pavlotskiy's detention was *already* found to be unnecessary to serve its purpose. ICE previously found that he need not be incarcerated to prevent flight or to protect the community, and no circumstances have changed that would justify re-arrest [Copy of Mr. Pavlotskiy's ICE release from custody and Order of Supervision is annexed as Exhibit F].

---

know/index.html (Rumeysa Ozturk, arrested in Boston and transferred to Louisiana); Kyle Cheney & Josh Gerstein, Trump is seeking to deport another academic who is legally in the country, lawsuit says, Politico (Mar. 19, 2025), available at https://www.politico.com/news/2025/03/19/trumpdeportationgeorgetown-graduate-student-00239754 (Badar Khan Suri, arrested in Arlington, Virginia and transferred to Texas).

23. Therefore, at a minimum, in order to lawfully re-arrest the Petitioner-Plaintiff, the government must first establish, by clear and convincing evidence and before a neutral decision maker, that he is a danger to the community or a flight risk, such that his re-incarceration is necessary.

24. By statute and regulation, ICE has the authority to re-detain a noncitizen on an OSUP previously ordered removed only in specific circumstances, including where an individual violates any condition of release or the individual's conduct demonstrates that release is no longer appropriate. 8 U.S.C. § 1231; 8 C.F.R. § 241.4(l)(1)-(2). That authority, however, is proscribed by the Due Process Clause because it is well-established that individuals released from incarceration have a liberty interest in their freedom. In turn, to protect that interest, on the particular facts of the Petitioner-Plaintiff's case, due process requires notice and a hearing, prior to any re-detention, at which he was afforded the opportunity to advance his arguments as to why he should not be re-detained.

25. Here, Respondents created a reasonable expectation that Mr. Pavlotskiy would be permitted to live and work in the United States without being subject to an arbitrary arrest.

26. This reasonable expectation creates constitutionally-protected liberty and property Interests, see: Perry v. Sindermann, 408 U.S. 593, 601–03 (1972) (reliance on policies and practices may establish a legitimate claim of entitlement to a constitutionally-protected interest); see also: Texas v. United States, 809 F.3d 134, 174 (2015), affirmed by an equally divided court, 136 S.Ct. 2271 (2016) (explaining that "DACA involve[s] issuing benefits" to certain applicants). These benefits are entitled to constitutional protections no matter how they may be characterized by Respondents, see: e.g., Newman v. Sathyavaglswaran, 287 F.3d 786, 797 (9th Cir. 2002) ("[T]he identification of property interests under constitutional law turns on the substance of the interest

recognized, not the name given that interest by the state or other independent source.") (internal quotations omitted).

27. Further, the Supreme Court has limited the potentially indefinite post-removal order detention to a maximum of six months, because removal is not reasonably foreseeable, see: Zadvydas v. Davis, 533 U.S. 678, 701 (2001). Because Mr. Pavlotskiy is stateless, and ICE has already been unsuccessful in removing him from the United States, he should not be re-detained unless and until DHS proves to an immigration judge that given his detention has the potential to be unconstitutionally indefinite, that his removal from the U.S. is actually reasonably foreseeable.

28. Several federal district courts have already ordered similar relief [Copies of orders for the same relief under the same circumstances are annexed as Exhibit G].

29. During any custody redetermination hearing that occurs, the Immigration Judge must further consider whether, in lieu of detention, alternatives to detention exist to mitigate any risk that DHS may establish. Any re-detention without any reasonably foreseeable end point will be unconstitutionally prolonged in violation of clear Supreme Court precedent.

30. Moreover, under the INA, Respondents have a statutory obligation to remove Mr. Pavlotskiy only to the designated country of removal – in this case, USSR [A country that does not exist], see: 8 U.S.C. §1231(b)(2)(A)(ii).

31. If Mr. Pavlotskiy is to be removed to a third country, Respondents must first assert a basis under 8 U.S.C. § 1231(b)(2)(C) and ICE must provide him with sufficient notice and an opportunity to respond and apply for fear-based relief as to that country, in compliance with the INA, due process, and the binding international treaty: The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

32. For example, Mr. Pavlotskiy would have a legitimate fear, which would require judicial review if he, as a practicing person of Jewish faith, was to be removed to a country with a record of hostility against individuals of Jewish faith.

33. Currently, DHS has a policy of removing or seeking to remove individuals to third countries without first providing constitutionally adequate notice of third country removal, or any meaningful opportunity to contest that removal if the individual has a fear of persecution or torture in that country [Copy of the DHS Policy Regarding Third Country Removal annexed as Exhibit H].

34. The U.S. District Court for the District of Massachusetts previously issued a nationwide preliminary injunction blocking such third country removals without notice and a meaningful opportunity to apply for relief under the Convention Against Torture, in recognition that the government's policy violates due process and the United States' obligations under the Convention Against Torture. D.V.D., et al. v. U.S. Department of Homeland Security, et al., No. 25-10676-BEM (D.Mass. Apr. 18, 2025). The U.S. Supreme Court has since granted the government's motion to stay the injunction on June 23, 2025, just before the Court published Trump v. Casa, No. 24A884 (June 27, 2025) limiting nationwide injunctions. Thus, the Supreme Court's order, which is not accompanied by an opinion, signals only disagreement with nature, and not the substance. Several federal district courts have already ordered similar relief.

### CUSTODY

35. Mr. Pavlotskiy is currently released from custody on his own recognizance as directed by ICE. He is also on an Order of Supervision, which subjects him to ICE check-ins like the appointment which is expected to be announced any day. Such stringent requirements "impose conditions which significantly confine and restrain his freedom; this is enough to keep him in the

'custody' of [the DHS] within the meaning of the habeas corpus statute." <u>Jones v. Cunningham</u>, 371 U.S. 236, 243 (1963). See also: <u>Rodriguez v. Hayes</u>, 591 F.3d 1105, 1118 (9th Cir. 2009) (holding that comparable supervision requirements constitute "custody" sufficient to support habeas jurisdiction).

## JURISDICTION

36. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1651 (All Writs Act), 28 U.S.C. §§ 2201–02 (Declaratory Judgment Act), 28 U.S.C. § 2241 (habeas corpus), Article I, § 9, cl. 2 of the U.S. Constitution (the Suspension Clause), the Fourth and Fifth Amendments to the U.S. Constitution, 5 U.S.C. §§ 701-706 (Administrative Procedure Act), and the common law.

## REQUIREMENTS OF 28 U.S.C. § 2243

37. The Court must grant the petition for writ of habeas corpus or issue an order to show cause ("OSC") to Respondents "forthwith," unless the Petitioner-Plaintiff is not entitled to relief, see: 28 U.S.C. §2243. If an OSC is issued, the Court must require Respondents to file a return "within *three* days unless for good cause additional time, not exceeding twenty days, is allowed." *Id*. (emphasis added).

38. Courts have long recognized the significance of the habeas statute in protecting individuals from unlawful detention. The Great Writ has been referred to as "perhaps the most important writ known to the constitutional law, affording as it does a swift and imperative remedy in all cases of illegal restraint or confinement." *Fay v. Noia*, 372 U.S. 391, 400 (1963) (emphasis added).

39. Habeas corpus must remain a swift remedy. Importantly, "the statute itself directs courts to give petitions for habeas corpus 'special, preferential consideration to insure expeditious hearing

and determination.", see: <u>Yong v. INS</u>, 208 F.3d 1116, 1120 (9th Cir. 2000) (internal citations omitted). The Ninth Circuit warned against any action creating the perception "that courts are more concerned with efficient trial management than with the vindication of constitutional rights." *Id.*

VENUE

40. Venue is properly before this Court pursuant to 28 U.S.C. § 1391(e) because the Respondents are employees or officers of the United States, acting in their official capacity; because a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District of New York; because Mr. Pavlotskiy is under the jurisdiction of the ICE New York Office, which is in the jurisdiction of the Eastern District of New York; and because there is no real property involved in this action.

EXHAUSTION

41. For habeas claims, exhaustion of administrative remedies are prudential, not jurisdictional. <u>Hernandez v. Sessions</u>, 872 F.3d 976, 988 (9th Cir. 2017). A court may waive the prudential exhaustion requirement if "administrative remedies are inadequate or not efficacious, pursuit of administrative remedies would be a futile gesture, irreparable injury will result, or the administrative proceedings would be void." *Id.* (quoting <u>Laing v. Ashcroft</u>, 370 F.3d 994, 1000 (citation and quotation marks omitted)). Petitioner-Plaintiff asserts that exhaustion requirement is satisfied, as there is no administrative jurisdiction over this detention status because he already has a final order of removal.

42. No statutory exhaustion requirements apply to Petitioner-Plaintiff claim of unlawful custody in violation of his due process rights, and there are no administrative remedies that he needs to exhaust, see: <u>Am.-Arab Anti-Discrimination Comm. v. Reno</u>, 70 F.3d 1045, 1058 (9th Cir. 1995) (finding exhaustion to be a "futile exercise because the agency does not have jurisdiction

to review" constitutional claims); In re Indefinite Det. Cases, 82 F. Supp. 2d 1098, 1099 (C.D. Cal. 2000) (same).

## PARTIES

43. Petitioner-Plaintiff, Vadim Pavlotskiy, is a stateless person who has lived in the United States since 1991. In 2008, he was ordered removed on consent. Although born in USSR [in the area now known as Ukraine], Mr. Pavlotskiy has never been afforded citizenship in that country and has no right to return there. After he was ordered removed, ICE was unsuccessful in its attempts to remove him from the U.S. and he was released on an Order of Supervisor. Sixteen years later and in light of credible reports of ICE reincarcerating individuals at their check-ins, there is a strong likelihood that Mr. Pavlotskiy will be arrested and detained at his upcoming appointment, even though he poses no flight risk, presents no danger to the community, and his removal is not reasonably foreseeable.

44. Respondent William Joyce is the Acting Field Office Director of ICE in New York and is named in his official capacity. ICE is the component of the DHS that is responsible for detaining and removing noncitizens according to immigration law and oversees custody determinations. In his official capacity, he is the legal custodian of Mr. Pavlotskiy.

45. Respondent Todd M. Lyons is the Acting Director of ICE and is named in his official capacity. As the Senior Official Performing the Duties of the Director of ICE, he is responsible for the administration and enforcement of the immigration laws of the United States, including the removal of noncitizens. In his official capacity, he is the legal custodian of Mr. Pavlotskiy.

46. Respondent Kristi Noem is the Secretary of the U.S. Department of Homeland Security (DHS) and is named in her official capacity. DHS is the federal agency encompassing ICE, which is responsible for the administration and enforcement of the INA and all other laws relating to the

immigration of noncitizens. In her capacity as Secretary, Respondent Noem has responsibility for the administration and enforcement of the immigration and naturalization laws pursuant to section 402 of the Homeland Security Act of 2002, 107 Pub. L. No. 296, 116 Stat. 2135 (Nov. 25, 2002); see also: 8 U.S.C. § 1103(a). In that capacity and through her agents, Respondent Noem has broad authority over and responsibility for the operation and enforcement of immigration laws and is legally responsible for pursuing any effort to detain and remove Mr. Pavlotskiy. Respondent Noem is sued in her official capacity.

47. Respondent Pam Bondi is the Attorney General of the United States and the most senior official at the Department of Justice and is named in her official capacity. In that capacity and through her agents, she is responsible for overseeing the implementation and enforcement of the federal immigration laws. The Attorney General delegates this responsibility to the Executive Office for Immigration Review, which administers the immigration courts and the BIA.

## STATEMENT OF FACTS

48. Mr. Pavlotskiy came to the United States in 1991 from the USSR under the Jackson-Vinick Amendment approved by Congress in 1974, which granted Refugee status to Soviet Jews fleeing religious persecution and antisemitism in a communist regime.

49. Mr. Pavlotskiy arrived on August 23, 1991, at the age of nineteen. He attended Kingsborough Community College and then Touro College in Brooklyn NY. Mr. Pavlotskiy was an avid athlete and worked as a personal trainer at gym and as a Security Guard.

50. At some point in time, Mr. Pavlotskiy began using Anabolic Steroids to enhance athletic performance and subsequently began to sell them to other athletes. He made several other unfortunate choices for which he was convicted in 1998 in the USDC EDNY [Exhibit A].

51. On May 23, 2008 [the date of his anticipated release] he was taken into custody by ICE where he consented to voluntary removal and applied to several countries including USSR's successor country, Ukraine, which responded that they have no record of him being a citizen of Ukraine and rejected his application for a travel document [Exhibit B].

52. After 109 days in detention ICE determined that his removal was not reasonably foreseeable. He was then declared a Stateless Person and placed under an Order of Supervision and released.

53. Mr. Pavlotskiy checked in with ICE on annual basis from 2008 until 2025 without any issues. He has not been charged with any crime since his release, and he is gainfully employed. He pays his Taxes.

54. Mr. Pavlotskiy resides with his wife Zhannetta Pavlotskiy who is a Registered Nurse and is currently in school to become a Nurse Practitioner. He has three stepchildren. Unfortunately, two of the children have been diagnosed with various psychiatric disorders and require constant care, which he actively provides. He also provides financial and physical assistance for his elderly parents [Exhibits C and D].

55. On January 8, 2017, Mr. Pavlotskiy began to feel severe chest pains and was admitted to Maimonides Hospital – Kings Hwy. and diagnosed with severe Hypertension and Arterial Fibrillation. He underwent a Cardioversion procedure and was released several days later with multiple prescriptions for medication which he continues to take to date on daily basis. He is under continues care of several physicians [Exhibit E].

56. Recently he was also diagnosed with Hernia, Kidney Calculus, Cyst on Kidneys, and Renal Colic, and Kidney Stones. Unfortunately, he requires multiple surgeries for these conditions [Exhibit E].

57. On August 7, 2025, Mr. Pavlotskiy was scheduled for his regular check-in with ICE, but the anxiety of a possibility that he may be detained for an indefinite period of time took over and Mr. Pavlotskiy ended up in an Emergency Room of Maimonides Hospital with chest pains [Copy of the check-in notice is enclosed as Exhibit I and copy of his hospital admission record is annexed as Exhibit J].

58. His wife promptly notified ICE in writing and provided proof of his hospital admission as well as requested a new check-in date. Prior to this unfortunate event, Mr. Pavlotskiy never missed a check-in [Copies of the correspondence from Mr. Pavlotskiy's wife to ICE is annexed as Exhibit K].

59. In recent months, ICE has engaged in highly publicized arrests of individuals who presented no flight risk or danger, often with no prior notice that anything regarding their status was amiss or problematic, whisking them away to faraway detention centers without warning, while ignoring the fact that their removal is highly unlikely.

60. In light of credible reports of ICE re-incarcerating individuals at their check-ins, it is highly likely Mr. Pavlotskiy will be arrested and detained at his appointment, despite the fact that his removal is not reasonably foreseeable and he is neither a flight risk nor a danger to the community. If he is arrested, he faces the very real possibility of being transferred outside of New York with little or no notice, far away from his spouse, children, attorney, community or his job.

61. Mr. Pavlotskiy is also at risk of being unlawfully removed to a third country without constitutionally adequate notice and a meaningful opportunity to apply for protection under the Convention Against Torture, in violation of the INA, binding international treaty, and due process.

62. Currently, DHS has a policy of removing or seeking to remove individuals to third countries without first providing adequate notice of third country removal, or any meaningful

opportunity to contest that removal if the individual has a fear of persecution or torture in that country [Exhibit H].

63. Intervention from this Court is therefore necessary to ensure that Mr. Pavlotskiy does not suffer irreparable harm in the form of unjustified, prolonged, and indefinite re-detention, and further violation of his rights in the form of summary removal to a third country.

## LEGAL BACKGROUND

### Right to a Hearing Prior to Re-incarceration

64. Following a final order of removal, ICE is directed by statute to detain an individual for ninety (90) days in order to effectuate removal. 8 U.S.C. § 1231(a)(2). This ninety (90) day period, also known as "the removal period," generally commences as soon as a removal order becomes administratively final. *Id.* at § 1231(a)(1)(A); § 1231(a)(1)(B).

65. If ICE fails to remove an individual during the ninety (90) day removal period, the law requires ICE to release the individual under conditions of supervision, including periodic reporting. 8 U.S.C. § 1231(a)(3) ("If the alien . . . is not removed within the removal period, the alien, pending removal, shall be subject to supervision."). Limited exceptions to this rule exist. Specifically, ICE "may" detain an individual beyond ninety days if the individual was ordered removed on criminal grounds or is determined to pose a danger or flight risk. 8 U.S.C. §1231(a)(6). However, ICE's authority to detain an individual beyond the removal period under such circumstances is not boundless. Rather, it is constrained by the constitutional requirement that detention "bear a reasonable relationship to the purpose for which the individual [was] committed." Zadvydas v. Davis, 533 U.S. 678, 690 (2001). Because the principal purpose of the post-final-order detention statute is to effectuate removal, detention bears no reasonable relation to its purpose if removal cannot be effectuated. *Id.* at 697.

66. Post-final order detention is only authorized for a "period reasonably necessary to secure removal," a period that the Court determined to be presumptively six months. *Id.* at 699-701.

67. After this six (6) month period, if a detainee provides "good reason" to believe that his or her removal is not significantly likely in the reasonably foreseeable future, "the Government must respond with evidence sufficient to rebut that showing." *Id.* at 701. If the government cannot do so, the individual must be released.

68. That said, detainees are entitled to be released even before six months of detention, as long as removal is not reasonably foreseeable, see: 8 C.F.R. § 241.13(b)(1) (authorizing release after ninety days where removal not reasonably foreseeable). Moreover, as the period of post-final order detention grows, what counts as "reasonably foreseeable" must conversely shrink. Zadvydas [supra] at 701.

69. Even where detention meets the Zadvydas standard for reasonable foreseeability, detention violates the Due Process Clause unless it is "reasonably related" to the government's purpose, which is to prevent danger or flight risk, see: Zadvydas, 533 U.S. at 700 ("If removal is reasonably foreseeable, the habeas court should consider the risk of the alien's committing further crimes as a factor potentially justifying confinement within that reasonable removal period") (emphasis added); *Id.* at 699 (purpose of detention is "assuring the alien's presence at the moment of removal"); *Id.* at 690-91 (discussing twin justifications of detention as preventing flight and protecting the community).

70. The government's own regulations contemplate this requirement. They dictate that even after ICE determines that removal is reasonably foreseeable, and that detention therefore does not per se exceed statutory authority, the government must still determine whether continued detention

is warranted based on flight risk or danger, see: 8 C.F.R. § 241.13(g)(2) (providing that where removal is reasonably foreseeable, "detention will continue to be governed under the established standards" in 8 C.F.R. § 241.4).

71. The regulations at 8 C.F.R. § 241.4 set forth the custody review process that existed even before <u>Zadvydas</u>. This mandated process, known as the post-order custody review, requires ICE to conduct "90-day custody reviews" prior to expiration of the ninety-day removal period and to consider release of individuals who pose no danger or flight risk. 8 C.F.R. § 241.4(e)-(f). Among the factors to be considered in these custody reviews are "ties to the United States such as the number of close relatives residing here lawfully"; whether the noncitizen "is a significant flight risk"; and "any other information that is probative of whether" the noncitizen is likely to "adjust to life in a community," "engage in future acts of violence," "engage in future criminal activity," pose a danger to themselves or others, or "violate the conditions of his or her release from immigration custody pending removal from the United States." *Id.*

72. Individuals with final orders who are released after a post-order custody review are subject to Forms I-220B, Order of Supervision. 8 C.F.R. § 241.4(j). After an individual has been released on an order of supervision, as Mr. Pavlotskiy was, ICE cannot revoke such an order without cause or adequate legal process, see: 8 C.F.R. § 241.13(i)(2)-(3).

**Mr. Pavlotskiy's Protected Liberty Interest in His Release**

73. Mr. Pavlotskiy's liberty from immigration custody is protected by the Due Process Clause: "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects.", <u>Zadvydas</u>, [supra], 533 U.S. at 690.

74. For more than sixteen years, Mr. Pavlotskiy has exercised that freedom under his prior release from ICE custody in 2008. He thus retains a weighty liberty interest under the Due Process Clause of the Fifth Amendment in avoiding re-incarceration, see: Young v. Harper, 520 U.S. 143, 146-47 (1997); Gagnon v. Scarpelli, 411 U.S. 778, 781-82 (1973); Morrissey v. Brewer, 408 U.S. 471, 482-483 (1972). Moreover, the Supreme Court has recognized that post-removal order detention is potentially indefinite and thus unconstitutional without some limitation. Zadvydas, 533 U.S. at 701.

75. In this case, in the absence of actually obtaining a travel document from a country that will accept the Petitioner-Plaintiff, his removal is not foreseeable at all, let alone reasonably. Therefore, re-detention is unconstitutional.

76. Just as importantly, Mr. Pavlotskiy has continued presenting himself before ICE for his regular check-in appointments for the past sixteen years, where ICE did not seek to re-arrest him during this time. ICE instead gave him a future date and time to appear again.

77. In Morrissey [supra] the Supreme Court examined the "nature of the interest" that a parolee has in "his continued liberty." 408 U.S. at 481-82. The Court noted that, "subject to the conditions of his parole, [a parolee] can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life." Id. at 482. The Court further noted that "the parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions." Id. The Court explained that "the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a grievous loss on the parolee and often others." Id. In turn, "[b]y whatever name, the liberty is valuable and must be seen within the protection of the Fifth Amendment.", see: Morrissey, 408 U.S. at 482.

78. This basic principle that individuals have a liberty interest in their release has been reinforced by both the Supreme Court and the Circuit Courts on numerous occasions. see: e.g., Young [supra], 520 U.S. at 152 (holding that individuals placed in a pre-parole program created to reduce prison overcrowding have a protected liberty interest requiring pre-deprivation process); Gagnon [supra], 411 U.S. at 781-82 (holding that individuals released on felony probation have a protected liberty interest requiring pre-deprivation process). As the First Circuit has explained, when analyzing the issue of whether a specific conditional release rises to the level of a protected liberty interest, "courts have resolved the issue by comparing the specific conditional release in the case before them with the liberty interest in parole as characterized by Morrissey." Gonzalez-Fuentes v. Molina, 607 F.3d 864, 887 (1st Cir. 2010) (internal quotation marks and citation omitted). See also, e.g., Hurd v. District of Columbia, 864 F.3d 671, 683 (D.C. Cir. 2017) ("a person who is in fact free of physical confinement— even if that freedom is lawfully revocable— has a liberty interest that entitles him to constitutional due process before he is re-incarcerated") (citing Young, 520 U.S. at 152, Gagnon, 411 U.S. at 782, and Morrissey, 408 U.S. at 482).

79. In fact, it is well-established that an individual maintains a protectable liberty interest even where the individual obtains liberty through a mistake of law or fact, See id.; Gonzalez-Fuentes, 607 F.3d at 887; Johnson v. Williford, 682 F.2d 868, 873 (9th Cir. 1982) (noting that due process considerations support the notion that an inmate released on parole by mistake, because he was serving a sentence that did not carry a possibility of parole, could not be reincarcerated because the mistaken release was not his fault, and he had appropriately adjusted to society, so it "would be inconsistent with fundamental principles of liberty and justice" to return him to prison) (internal quotation marks and citation omitted).

80. Here, when this Court compares the specific conditional release in [Mr. Pavlotskiy's case], with the liberty interest in parole as characterized by Morrissey, it is clear that they are strikingly similar, See: Gonzalez-Fuentes, 607 F.3d at 887. Just as in Morrissey, Mr. Pavlotskiy's release enables him to do a wide range of things open to persons who have never been in custody or convicted of any crime, including to live at home, work with his community, and be with family and friends and to form the other enduring attachments of normal life, Morrissey, 408 U.S. at 482.

81. Since his release in 2008, which came after approximately 109 days in ICE custody, Mr. Pavlotskiy has been focused on being a good citizen, a husband, a father, and a good son by stable life for his family.

## Mr. Pavlotskiy's Liberty Interest Mandates a Due Process Hearing Before any Re-Detention

82. Mr. Pavlotskiy asserts that, here, (1) where his detention is civil, (2) where he has been at liberty for sixteen years, during which time he has complied with all conditions of release and served as the sole provider for his wife, kids and parents, (3) where he has diligently complied with ICE's reporting requirements on a regular basis, (4) where no change in circumstances exist that would justify his detention, and (5) where the only circumstance that has changed is not related to Mr. Pavlotskiy, but is ICE's move to arrest as many people as possible because of the new administration, due process mandates that he receive notice and a hearing before a neutral adjudicator *prior* to any re-arrest or re-detention. Several federal District Courts across the Country have already ordered similar relief.

83. Adequate, or due, process depends upon the nature of the interest affected. The more important the interest and the greater the effect of its impairment, the greater the procedural safeguards the government must provide to satisfy due process, See: Haygood v. Younger, 769 F.2d 1350, 1355-56 [en banc] (citing Morrissey, 408 U.S. at 481-82). This Court must "balance

[Mr. Pavlotskiy's] liberty interest against the [government's] interest in the efficient administration of" its immigration laws in order to determine what process he is owed to ensure that ICE does not unconstitutionally deprive him of his liberty. Id. at 1357.

84. Under the test set forth in Mathews v. Eldridge, 424 U.S. 319, 335 (1976), this Court must consider three factors in conducting its balancing test: "first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probative value, if any, of additional or substitute procedural safeguards; and finally the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." Haygood, 769 F.2d at 1357 (citing Mathews, 424 U.S. at 335).

85. The Supreme Court "usually has held that the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property." See: Zinermon v. Burch, 494 U.S. 113, 127 (1990) (emphasis in original). Only in a "special case" where post-deprivation remedies are "the only remedies the State could be expected to provide" can post-deprivation process satisfy the requirements of due process. Zinermon, 494 U.S. at 985. Moreover, only where "one of the variables in the Mathews equation—the value of pre-deprivation safeguards—is negligible in preventing the kind of deprivation at issue" such that "the State cannot be required constitutionally to do the impossible by providing pre-deprivation process," can the government avoid providing pre-deprivation process. *Id.*

86. Because, in this case, the provision of a pre-deprivation hearing is both possible and valuable to preventing an erroneous deprivation of liberty, ICE is required to provide the Petitioner-Plaintiff with notice and a hearing prior to any re-incarceration and revocation of his Order of Supervision. See: Morrissey, 408 U.S. at 481-82; Haygood, 769 F.2d at 1355-56; Jones,

393 F.3d at 932; Zinermon, 494 U.S. at 985; see also: Youngberg v. Romeo, 457 U.S. 307, 321-24 (1982); Lynch v. Baxley, 744 F.2d 1452 (11th Cir. 1984) (holding that individuals awaiting involuntary civil commitment proceedings may not constitutionally be held in jail pending the determination as to whether they can ultimately be recommitted). Under Mathews, "the balance weighs heavily in favor of [Mr. Pavlotskiy's] liberty" and requires a pre-deprivation hearing before a neutral adjudicator, such as an Immigration Judge.

**Mr. Pavlotskiy's Private Interest in His Liberty is Profound**

87.    Under Morrissey and its progeny, individuals conditionally released from serving criminal sentences have a liberty interest that is "valuable." Morrissey, 408 U.S. at 482. In addition, the principles espoused in Hurd and Johnson that a person who is in fact free of physical confinement, even if that freedom is lawfully revocable, has a liberty interest that entitles him to constitutional due process before he is re-incarcerated – apply with even greater force to individuals like Mr. Pavlotskiy, who have also been released from prior ICE custody. Even in the criminal parolee context, the courts have held that the parolee cannot be re-arrested without a due process hearing in which they can raise any claims they may have regarding why their re-incarceration would be unlawful. See: Gonzalez-Fuentes, 607 F.3d 864 at 891-892; Hurd, 864 F.3d at 683. Thus, Mr. Pavlotskiy retains a truly weighty liberty interest even though he is under conditional release. What is at stake in this case for Mr. Pavlotskiy is one of the most profound individual interests recognized by our legal system: whether ICE may unilaterally nullify a prior release decision and be able to take away his physical freedom, i.e., his "constitutionally protected interest in avoiding physical restraint." Singh v. Holder, 638 F.3d 1196, 1203 (internal quotation omitted). "Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause." Foucha v. Louisiana, 504 U.S. 71, 80 (1992). See also: Zadvydas, 533

U.S. at 690 ("Freedom from imprisonment from government custody, detention, or other forms of physical restraint lies at the heart of the liberty that [the Due Process] Clause protects."); Cooper v. Oklahoma, 517 U.S. 348 (1996).

88. Thus, it is clear that there is a profound private interest at stake in this case, which must be weighed heavily when determining what process he is owed under the Constitution, See: Mathews, 424 U.S. at 334-35.

**The Government's Interest in Re-Incarcerating the Petitioner-Plaintiff Without a Hearing is Low and the Burden on the Government to Refrain from Re-Arresting Him Unless and Until He is Provided a Hearing That Comports with Due Process is Minimal**

89. The government's interest in detaining the Petitioner-Plaintiff without due process hearing is low, and when weighed against the Petitioner-Plaintiff's significant private interest in his liberty, the scale tips sharply in favor of enjoining Respondents from re-arresting the Petitioner-Plaintiff unless and until the government demonstrates by clear and convincing evidence that he is a flight risk or danger to the community, and that his removal is reasonably foreseeable. It becomes abundantly clear that the Mathews test favors the Petitioner-Plaintiff when the Court considers that the process he seeks notice and a hearing regarding whether his release should be revoked and, if so, whether a bond amount should be set is a standard course of action for the government.

90. Providing the Petitioner-Plaintiff with a hearing before this Court (or a neutral decisionmaker) to determine whether there is clear and convincing evidence that the Petitioner-Plaintiff is a flight risk or danger to the community, and whether his removal is reasonably foreseeable, would impose only a *de minimis* burden on the government, because the government routinely provides this sort of hearing to individuals like the Petitioner-Plaintiff.

91. As immigration detention is civil, it can have no punitive purpose. The government's only interests in holding an individual in immigration detention can be to prevent danger to the

community or to ensure a noncitizen's appearance at immigration proceedings. See: <u>Zadvydas</u>, 533 U.S. at 690. In this case, the government cannot plausibly assert that it has any basis for detaining the Petitioner-Plaintiff in July 2025 when he has lived at liberty complying with the conditions of his release since 2008.

92. Enjoining the Petitioner-Plaintiff's re-arrest until ICE (1) moves for a custody re-determination before an IJ and (2) demonstrates by clear and convincing evidence that The Petitioner-Plaintiff is a flight risk or danger to the community is far less costly and burdensome for the government than keeping him detained. As the Ninth Circuit noted in 2017, which remains true today, "the costs to the public of immigration detention are 'staggering': $158 each day per detainee, amounting to a total daily cost of $6.5 million.", See: <u>Hernandez</u>, 872 F.3d at 996.

**Without a Due Process Hearing Prior to Any Re-Arrest, the Risk of an Erroneous Deprivation of Liberty is High, and Process in the Form of a Constitutionally Compliant Hearing Where ICE Carries the Burden Would Decrease That Risk**

93. Providing the Petitioner-Plaintiff with a pre-deprivation hearing would decrease the risk of him being erroneously deprived of his liberty. Before The Petitioner-Plaintiff can be lawfully detained, he must be provided with a hearing before a neutral adjudicator at which the government is held to show that there has been sufficiently changed circumstances such that its 2008 determination should be altered or revoked because clear and convincing evidence exists to establish that Mr. Pavlotskiy is a danger to the community or a flight risk, and that his removal is reasonably foreseeable. Under ICE's process for custody determination, which affords The Petitioner-Plaintiff no process whatsoever, ICE can simply re-detain him at any point if the agency desires to do so. The risk that the Petitioner-Plaintiff will be erroneously deprived of his liberty is high if ICE is permitted to reincarcerate him after making a unilateral decision to re-arrest him.

94. The Petitioner-Plaintiff seeks a hearing in front of a neutral adjudicator at which the government must prove by clear and convincing evidence that circumstances have changed to justify his detention before any re-arrest is much more likely to produce accurate determinations regarding factual disputes, such as whether a certain occurrence constitutes a "changed circumstance." See: <u>Chalkboard, Inc. v. Brandt</u>, 902 F.2d 1375, 1381 (when "delicate judgments depending on credibility of witnesses and assessment of conditions not subject to measurement" are at issue, the "risk of error is considerable when just determinations are made after hearing only one side"). "A neutral judge is one of the most basic due process protections." <u>Castro-Cortez v. INS</u>, 239 F.3d 1037, 1049, abrogated on other grounds by <u>Fernandez-Vargas v. Gonzales</u>, 548 U.S. 30 (2006). The Ninth Circuit has noted that the risk of an erroneous deprivation of liberty under <u>Mathews</u> can be decreased where a neutral decisionmaker, rather than ICE alone, makes custody determinations. <u>Diouf v. Napolitano ("Diouf II")</u>, 634 F.3d 1081, 1091-92 (9th Cir. 2011).

95. Due process also requires consideration of alternatives to detention at any custody redetermination hearing that may occur. The primary purpose of immigration detention is to ensure a noncitizen's appearance during removal proceedings. <u>Zadvydas</u>, 533 U.S. at 697. Detention is not reasonably related to this purpose if there are alternatives to detention that could mitigate risk of flight. See: <u>Bell v. Wolfish</u>, 441 U.S. 520, 538 (1979). Accordingly, alternatives to detention must be considered in determining whether The Petitioner-Plaintiff's re-incarceration is warranted.

**<u>Right to Constitutionally Adequate Procedures Prior to Third Country Removal</u>**

96. Under the INA, Respondents-Defendants have a clear and non-discretionary duty to execute final orders of removal only to the designated country of removal. The statute explicitly states that a noncitizen "shall remove the [noncitizen] to the country the [noncitizen] . . . designates." 8 U.S.C. § 1231(b)(2)(A)(ii). And even where a noncitizen does not designate the

country of removal, the statute further mandates that DHS "shall remove the alien to a country of which the alien is a subject, national, or citizen. See id.; 8 U.S.C. §1231(b)(2)(D); see also generally Jama v. ICE, 543 U.S. 335, 341 (2005).

97. As the Supreme Court has explained, such language "generally indicates a command that admits of no discretion on the part of the person instructed to carry out the directive," Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 661 (2007) (quoting Ass'n of Civilian Technicians v. Fed. Labor Relations Auth., 22 F.3d 1150, 1153 (D.C. Cir. 1994)); see also Black's Law Dictionary (11th ed. 2019) ("Shall" means "[h]as a duty to; more broadly, is required to . . . . This is the mandatory sense that drafters typically intend and that courts typically uphold."); United States v. Monsanto, 491 U.S. 600, 607 (1989) (finding that "shall" language in a statute was unambiguously mandatory). Accordingly, any imminent third country removal fails to comport with the statutory obligations set forth by Congress in the INA and is unlawful.

98. Moreover, prior to any third country removal, ICE must provide The Petitioner-Plaintiff with sufficient notice and an opportunity to respond and apply for fear-based relief as to that country, in compliance with the INA, due process, and the binding international treaty: The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. Currently, DHS has a policy of removing or seeking to remove individuals to third countries without first providing constitutionally adequate notice of third country removal, or any meaningful opportunity to contest that removal if the individual has a fear of persecution or torture in that country. This policy clearly violates due process and the United States' obligations under the Convention Against Torture.

99. The U.S. District Court for the District of Massachusetts previously issued a nationwide preliminary injunction blocking such third country removals without notice and a meaningful

opportunity to apply for relief under the Convention Against Torture, in recognition that the government's policy violates due process and the United States' obligations under the Convention Against Torture. D.V.D., et al. v. U.S. Department of Homeland Security, et al., No. 25-10676-BEM (D. Mass. Apr. 18, 2025). The U.S. Supreme Court has since granted the government's motion to stay the injunction on June 23, 2025, just before the Court published Trump v. Casa, No. 24A884 (June 27, 2025) limiting nationwide injunctions. Thus, the Supreme Court's order, which is not accompanied by an opinion, signals only disagreement with nature, and not the substance, of the nationwide preliminary injunction.

100. Thus, it is clear that if The Petitioner-Plaintiff were to be removed to any third country it would violate his due process rights unless he is first provided with constitutionally adequate notice and a meaningful opportunity to apply for protection under the Convention Against Torture. In the absence of any other injunction, intervention by this Court is necessary to protect those rights.

**Despite the Fact that the Petitioner-Plaintiff is not in Custody Habeas Relief is the Appropriate <u>Remedy Where the Petitioner-Plaintiff Remains Under the Jurisdiction & Control of the Respondents</u>**

101. Besides physical imprisonment, there are other restraints on man's liberty, restraints not shared by public generally, which support issuance of habeas corpus, such as individuals on Probation, Parole, or Order of Supervision, See: Ingle v. Fitzharris, 283 F. Supp. 205, 1968 U.S. Dist. LEXIS 7816 (N.D. Cal. 1968), aff'd, 411 F.2d 611, 1969 U.S. App. LEXIS 12501 (9th Cir. 1969); Cooper v. King, 303 F. Supp. 876, 1969 U.S. Dist. LEXIS 10364 (N.D. W. Va. 1969); Scarpelli v. Gagnon, 317 F. Supp. 72, 1970 U.S. Dist. LEXIS 10188 (E.D. Wis. 1970), aff'd, 454 F.2d 416, 1971 U.S. App. LEXIS 6406 (7th Cir. 1971); Jones v. Cunningham, 371 U.S. 236, 83 S. Ct. 373, 9 L. Ed. 2d 285, 1963 U.S. LEXIS 2261 (1963) ; Hensley v. Municipal Court, San Jose-

Milpitas Judicial Dist., 411 U.S. 345, 93 S. Ct. 1571, 36 L. Ed. 2d 294, 1973 U.S. LEXIS 81 (1973), limited, Polakoff v. United States, 489 F.2d 727, 1974 U.S. App. LEXIS 10060 (5th Cir. 1974) ; Foster v. Gilbert, 264 F. Supp. 209, 1967 U.S. Dist. LEXIS 7795 (S.D. Fla. 1967).

102. Courts have consistently held that the right to seek a Writ of Habeas Corpus is a constitutional right that cannot be abridged by the Government, See: Ex parte Hull, 312 U.S. 546, 61 S. Ct. 640, 85 L. Ed. 1034, 1941 U.S. LEXIS 882 (1941), reh'g denied, 312 U.S. 716, 61 S. Ct. 823, 85 L. Ed. 1146, 1941 U.S. LEXIS 817 (1941), limited, Tabor v. Hardwick, 224 F.2d 526, 1955 U.S. App. LEXIS 4112 (5th Cir. 1955); Johnson v. Avery, 393 U.S. 483, 89 S. Ct. 747, 21 L. Ed. 2d 718, 1969 U.S. LEXIS 2442 (1969), limited, Wilkerson v. Warden of U. S. Reformatory, 465 F.2d 956, 1972 U.S. App. LEXIS 8033 (10th Cir. 1972); Bismullah v. Gates, 551 F.3d 1068, 384 U.S. App. D.C. 145, 2009 U.S. App. LEXIS 334 (D.C. Cir. 2009); United States ex rel. Bongiorno v. Ragen, 54 F. Supp. 973, 1944 U.S. Dist. LEXIS 2529 (D. Ill. 1944), aff'd, 146 F.2d 349, 1945 U.S. App. LEXIS 2051 (7th Cir. 1945).

103. In the current environment it is clearly evident that ICE prevents people in custody from seeking Habeas relief by quickly removing them from the place of detention to other facilities across the country. For example, people detained in New York have been systematically sent to detention facilities in Louisiana. It would take days and/or weeks for a person to arrive at a new facility, make contact with family, retain counsel, and seek a Habeas relief. Moreover, counsel that the person may have retained can no longer help him, as the person is now in another State on the opposite side of the country.

## FIRST CAUSE OF ACTION
### Violation of the Fifth Amendment to the United States Constitution
#### (Procedural Due Process—Re-Detention)

104. The Petitioner-Plaintiff re-alleges and incorporates herein by reference, as is set forth fully herein, the allegations in all the preceding paragraphs.

105. The Due Process Clause of the Fifth Amendment forbids the government from depriving any "person" of liberty "without due process of law." U.S. Const. Amend. V.

106. The Petitioner-Plaintiff was previously released by Respondents because his removal was not reasonably foreseeable, and he did not pose a danger or flight risk. As long as he complies with the conditions of his release, Respondents have authority to revoke release only if circumstances have changed. 8 C.F.R. § 241.13(i)(2); 8 C.F.R. § 1231(a)(6).

107. The Petitioner-Plaintiff has a vested liberty interest in his conditional release. Due Process does not permit the government to strip him of that liberty without a hearing before this Court. See Morrissey, 408 U.S. at 487-488.

108. Other than as punishment for a crime, due process permits the government to take away liberty only "in certain special and narrow nonpunitive circumstances ... where a special justification ... outweighs the individual's constitutionally protected interest in avoiding physical restraint." Zadvydas, 533 U.S. 678, 690. Such special justification exists only where a restraint on liberty bears a "reasonable relation" to permissible purposes. Jackson v. Indiana, 406 U.S. 715, 738 (1972); see also Foucha v. Louisiana, 504 U.S. 71, 79 (1992). In the immigration context, those purposes are "ensuring the appearance of aliens at future immigration proceedings and preventing danger to the community." Zadvydas, 533 U.S. at 690 (quotations omitted).

109. Those substantive limitations on detention are closely intertwined with procedural due process protections. Foucha, 504 U.S. 78-80. Noncitizens have a right to adequate procedures to

determine whether their detention in fact serves the purpose of ensuring their appearance or protecting the community. Id. at 79; Zadvydas, 533 U.S. 692; Casas-Castrillon v. Dep't of Homeland Sec., 535 F.3d 942, 949. Where laws and regulations fail to provide such procedures, the habeas court may assess whether the noncitizen's immigration detention is reasonably related to the purposes of ensuring his appearance or protecting the community, Zadvydas, 533 U.S. at 699, or require release.

110. The INA provides for detention during the ninety (90) day "removal period" that begins immediately after a noncitizen's order of removal becomes final. 8 U.S.C. § 1231(a)(1). After the ninety (90) day removal period, the INA and its applicable regulations provide that detaining noncitizens is generally permissible only upon notice to the noncitizen and after an individualized determination of dangerousness and flight risk. See 8 U.S.C. § 1231(a)(6); 8 C.F.R. § 241.4(d),(f), (h) & (k).

111. Respondents-Defendants are not permitted to detain The Petitioner-Plaintiff on the basis of his prior order of removal and without any determination of whether circumstances have changed such that his removal is reasonably foreseeable, and a determination of his danger and flight risk, by an immigration judge. This is especially true where, as here, The Petitioner-Plaintiff received a determination from the agency issuing his Form I-220B that permitted him to remain out of custody in the first place. 8 C.F.R. § 241.13(i)(2)-(3).

112. The Court should therefore order that, prior to any re-arrest, the government must provide him with a hearing before a neutral adjudicator. At the hearing, the neutral adjudicator would evaluate, inter alia, whether clear and convincing evidence demonstrates that circumstances have changed such that The Petitioner-Plaintiff's removal is reasonably foreseeable, and a determination of his danger and flight risk, such that re-detention is warranted. During any custody

redetermination hearing that occurs, this Court or, in the alternative, a neutral adjudicator must consider alternatives to detention.

## SECOND CAUSE OF ACTION
### Violation of the Fifth Amendment to the United States Constitution
### (Procedural Due Process - Unconstitutionally Inadequate Procedures Regarding Third Country Removal)

113. Petitioner-Plaintiff re-alleges and incorporates herein by reference, as if set forth fully herein, the allegations in all the preceding paragraphs.

114. The Due Process Clause of the Fifth Amendment requires sufficient notice and an opportunity to be heard prior to the deprivation of any protected rights. U.S. Const. amend. V; see also Louisiana Pacific Corp. v. Beazer Materials & Services, Inc., 842 F.Supp. 1243, 1252 (E.D. Cal. 1994) ("Due process requires that government action falling within the clause's mandate may only be taken where there is notice and an opportunity for hearing.").

115. The Petitioner-Plaintiff has a protected interest in his life. Thus, prior to any third country removal, The Petitioner-Plaintiff must be provided with constitutionally compliant notice and an opportunity to respond and contest that removal if he has a fear of persecution or torture in that country.

116. For these reasons, The Petitioner-Plaintiff removal to any third country without adequate notice and an opportunity to apply for relief under the Convention Against Torture would violate his due process rights. The only remedy of this violation is for this Court to order that he not be summarily removed to any third country unless and until he is provided with constitutionally adequate procedures.

## THIRD CAUSE OF ACTION
### Violation of the INA
### (Re-Detention)

117. The Petitioner-Plaintiff re-alleges and incorporates herein by reference, as is set forth fully herein, the allegations in all the preceding paragraphs.

118. The INA provides for detention during the ninety (90) day "removal period" that begins immediately after a noncitizen's order of removal becomes final. 8 U.S.C. § 1231(a)(1). After the ninety (90) day removal period, the INA and its applicable regulations provide that detaining noncitizens is generally permissible only upon notice to the noncitizen and after an individualized determination of dangerousness and flight risk. *See* 8 U.S.C. § 1231(a)(6); 8 C.F.R. § 241.4(d), (f), (h) & (k).

119. Respondents are not permitted to detain The Petitioner-Plaintiff on the basis of his prior order of removal and without any determination of whether circumstances have changed such that his removal is reasonably foreseeable, and a determination of his danger and flight risk, by an Immigration Judge. This is especially true where, as here, The Petitioner-Plaintiff received a determination from the agency issuing his Form I-220B that permitted him to remain out of custody in the first place. 8 C.F.R. § 241.13(i)(2)-(3).

120. The Court should therefore order that, prior to any re-arrest, the government must provide him with a hearing before a neutral adjudicator. At the hearing, the neutral adjudicator would evaluate, *inter alia,* whether clear and convincing evidence demonstrates that circumstances have changed such that The Petitioner-Plaintiff's removal is reasonably foreseeable, and a determination of his danger and flight risk, such that re-detention is warranted. During any custody redetermination hearing that occurs, this Court or, in the alternative, a neutral adjudicator must consider alternatives to detention.

## PRAYER FOR RELIEF

**WHEREFORE**, The Petitioner-Plaintiff prays that this Honorable Court grants the following relief:

A. Assume jurisdiction over this matter;

B. Enjoin ICE from re-arresting The Petitioner-Plaintiff unless and until a hearing can be held before a neutral adjudicator to determine whether his re-incarceration would be lawful because the government has shown that his removal is reasonably foreseeable, and that he is a danger or a flight risk by clear and convincing evidence;

C. Declare that The Petitioner-Plaintiff cannot be re-arrested unless and until he is afforded a hearing on the question of whether his re-incarceration would be lawful— i.e., whether the government has demonstrated to a neutral adjudicator that he is a danger or a flight risk by clear and convincing evidence;

D. Order that, prior to any future re-detention, The Petitioner-Plaintiff is provided a hearing before an immigration judge where the government bears the burden of justifying The Petitioner-Plaintiff re-detention, and that the immigration judge must further consider whether, in lieu of detention, alternatives to detention exist to mitigate any risk that DHS may establish;

E. Order that The Petitioner-Plaintiff cannot be removed to any third country without first being provided constitutionally compliant procedures, including:

   i. Written notice to The Petitioner-Plaintiff and counsel of the third country to which he may be removed, in a language that The Petitioner-Plaintiff can understand, provided at least 21 days before any such removal;

   ii. A meaningful opportunity for The Petitioner-Plaintiff to raise a fear of return for eligibility for protection under the Convention Against Torture, including a reasonable fear interview before a DHS officer;

   iii. If The Petitioner-Plaintiff demonstrates a reasonable fear during the interview, DHS must move to reopen his underlying removal proceedings so that he may apply for relief under the Convention Against Torture;

   iv. If it is found that The Petitioner-Plaintiff does not demonstrate a reasonable fear during the interview, a meaningful opportunity, and a minimum of 15 days, for The Petitioner-Plaintiff to seek to move to reopen his underlying removal proceedings to challenge potential third-country removal;

F. Such other and further relief as this Honorable Court deems just and proper.

Dated: Yorktown Heights, New York
        August 17, 2025

                                Respectfully,

                                John P. Stebe, Esq.
                                *Attorney for Petitioner-Plaintiff*

## VERIFICATION PURSUANT TO 28 U.S.C. 2242

I AM SUBMITTING THIS VERIFICATION ON BEHALF OF THE PETITIONER-PLAINTIFF-PLAINTIFF BECAUSE I AM THE PETITIONER-PLAINTIFF'S ATTORNEY. I HAVE DISCUSSED WITH THE PETITIONER-PLAINTIFF THE EVENTS DESCRIBED IN THE PETITION. BASED ON THOSE DISCUSSIONS, I HEREBY VERIFY THAT THE FACTUAL STATEMENTS MADE IN THE ATTACHED PETITION FOR WRIT OF HABEAS CORPUS ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.


DATED: YORKTOWN HEIGHTS, NEW YORK
       AUGUST 19, 2025

JOHN P. STEBE, ESQ.

Exhibit A

DF

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JUDGMENT IN A CRIMINAL CASE

UNITED STATES OF AMERICA
- vs -

CR-99-19(S-1)

VADIM PAVLOTSKIY          BROOKLYN OFFICE    CASE NO.: CR-99-23(S-3)
                                             COUNSEL: DAVID JACOBS

THE DEFENDANT:
X__ pleaded guilty to count(s) 1 of 99-19(S-1) & 1&2 of 99-23(S-3)
X__ was found guilty on count(s) 2 of 99-19(S-1)
    after a plea of not guilty.

Accordingly, the defendant is adjudged guilty of such count(s),
which involve the following offenses:

| Title/Section | Nature of Offense | Date concluded | Count # |
|---|---|---|---|
| 21:846 and 21:841(b)(1)(D) | Conspiracy to possess & distribute steroids. | 11/30/98 | 1 of 99-19(s-1) |
| 18:924(c)(1)(A) | Possession of firearm. | 3/19/98 | 2 of 99-19(s-1) |
| 18:371 | Conspiracy to entice individuals to engage in prostitution and | 12/9/98 | 1 of 99-23(s-3) |
| 18:2422(a) | to travel interstate. | 12/9/98 | 2 of 99-23(s-3) |

    The deft is sentenced as provided in pgs. 2 through ___4___
of this judgment. The sentence is imposed pursuant to the
Sentencing Reform Act of 1984.

___ The deft has been found not guilty on cts. _____ and
    is discharged as to such cts.
X__ Count(s) Remaining is/are dismissed by The Court.
X__ It is ordered that the deft shall pay a special assessment of
    $ 400.00 for counts 1&2 of 99-19(S-1)and 1&2 of 99-23(S-3)

IT IS FURTHER ORDERED that the deft shall notify the U.S. attorney
for this district within 30 days of any change of name, residence,
or mailing address until all fines, restitution, costs, and special
assessments imposed by this judgment are fully paid.

Defts S.S. No. 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

Defts D.O.B. 4/28/72

Defts USM No: 56637-053

Defts residence address:

15 Cove Lane, Apt. 7B
Brooklyn, New York 11234

June 22, 2001
Date of imposition of sentence

Signature of Judicial Officer

NINA GERSHON, U.S.D.J.
Name/Title of Judicial Officer

A TRUE COPY
ATTEST
DATED _____ 2001
ROBERT C. HEINEMANN

BY _____ CLERK
DEPUTY CLERK

A TRUE COPY
ATTEST
DATE 11/24/2019
DOUGLAS C. PALMER

BY _____ CLERK
DEPUTY CLERK

(c/m)

(124)

Deft: VADIM PAVLOTSKIY          Judgment -Page      2 of  4
Case Number:   CR-99-19(S-1) 99-23(S-3)

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of:
<u>FORTY SIX (46) MONTHS CONCURRENT ON EACH OF THE FOLLOWING: COUNT 1 OF 99-19 (S-1) AND COUNTS 1&2 OF 99-23(S-3) FIVE(5) YEARS CONSECUTIVE ON COUNT 2 OF 99-19(S-1)</u>

___X___         The Court makes the following recommendations to the Bureau of Prisons:
                **Designation in the New York area.**

_____         The defendant is remanded to the custody of the U.S.Marshal.
_____         The defendant shall surrender to the U.S.Marshal for this district.
                ____ at _____ on _____

                ____ as notified by the U.S. Marshal.

_____         The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:
                ____ by _____
                ____ as notified by the U.S.Marshal.
                ____ as notified by the Probation Office.

### RETURN
I have executed this judgment as follows:_____

_____
_____
_____

Defendant delivered on _____ to _____
at _____ with a certified copy of this judgment.

                        _____
                                  United States Marshal

                        _____
                        By                Deputy Marshal

Case 1:99-cr-00019-NG   Document 242   Filed 06/29/01   Page 3 of 4 PageID #: 44

Deft: VADIM PAVLOTSKIY _____ Judgment - Page 3 of 4
Case Number: __ CR-99-19(S-1) 99-23(S-3)

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of THREE (3) YEARS CONCURRENT ON EACH COUNT.

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state , or local crime.

The defendant shall not illegally possess a controlled substance.

For offenses committed on or after September 13, 1994:

The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as directed by the probation officer.

___ The above drug testing condition is suspended based on the court's determination that the defendant poses a low risk of future substance abuse.

X ___ The defendant shall not possess a firearm as defined in 18 U.S.C. Section 921.

If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine or restitution that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth above.
The defendant shall comply with the standard conditions that have been adopted by this court (set forth below). The defendant shall also comply with the additional conditions set forth above.

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instruction of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) the defendant shall notify the probation officer ten days prior to any change in residence or employment;

7) the defendant shall refrain from excessive use of alcohol;

8) the defendant shall not frequent places where controlled substance are illegally sold, used, distributed, or administered;

9) the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer.

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement

Deft: VADIM PAVLOTSKIY _____ Judgment – Page  4 of  4
Case Number: _____ CR-99-19(S-1) 99-23(S-3)

### STATEMENT OF REASONS

____ The Court adopts the factual findings and guideline application in the presentence report.
_X_ The Court adopts the factual findings and guideline application in the presentence report except:

As stated on the record.

## Guideline Range Determined by the Court

Total Offense Level: _____ 21

Criminal History Category: ____ I ____

Imprisonment Range: ____ 37-46 MOS. ____

Supervised Release Range: ____ 2-3 YRS ____

Fine Range: $ _12,500.00_   to   _125,000.00_

_X_ Fine is waived or is below the guideline range, because of the defendant's inability to pay.


_X_ The sentence is within the guideline range, that range does not exceed 24 months, and the court finds no reason to depart from the sentence called for by the application of the guidelines.
                    OR
____ The sentence is within the guideline range, that range exceeds 24 months, and the sentence is imposed for the following reasons(s):

                    OR

The sentence departs from the guideline range:

____ Upon motion of the government, as a result of defendant's substantial assistance.

Exhibit B

| | | |
|---|---|---|
| **Посольство України**<br>**у Сполучених Штатах Америки**<br><br>**Консульський відділ** |  | **Embassy of Ukraine**<br>**to the United States of America**<br><br>**Consular Office** |

3350 M Street N.W. Washington D.C. 20007
tel. 202 349-2947 / fax 202 333-7510
e-mail: consular@ukremb.com
www.mfa.gov.ua/usa

July 28, 2008 p.
№6147/*2Н* - *534/1 - 2059*

**To:** Officer **Jay Dehmalo**

Detention and Removal Operations
U.S. Immigration and Customs Enforcement
United States Department of Homeland Security
1240 E. 9th STREET
535
Cleveland, OH 44199

*Re: travel document for Mr. Vadim Pavlotskiy (A#071078382)*

Dear Sir:

Please be advised that according to the information received from Ukrainian competent
authorities as well as per the results of examination of evidences provided with application
for travel document for Mr. Vadim Pavlotskiy, the subject was not found to be a citizen of
Ukraine and therefore he can not be issued a certificate for returning to Ukraine.

Let me know if I can be of any further assistance regarding this matter.

Sincerely,

Roman Andarak, vice-consul

Cc1: Michael Koransky
Cc2: Vadim Pavlotskiy

Exhibit C

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

VADIM PAVLOTSKIY,                                      :
                                                       :
                      Petitioner-Plaintiff,            :
                                                       :
            - vs -                                     :
                                                       :       **AFFDAVIT OF SPOUSE**
WILLIAM JOYCE, Acting Field Office                     :       **ZHANNETTA PAVLOTSKIY**
Director of the New York Immigration and               :
Customs Enforcement Office,                             :       Docket No.:
                                                       :
TODD LYONS, Acting Director of United                  :
States Immigration and Customs Enforcement,            :
                                                       :
KRISTI NOEM, Secretary of the United                   :
States Department of Homeland Security,                :
                                                       :
PAM BONDI, Attorney General of the United              :
States,                                                :
                                                       :
                      Respondents-Defendants.          :
---------------------------------------------------------------x

Zhannetta Pavlotskiy, deponent over the age of 18 and a resident of Brooklyn NY, deposes

and says under the penalty of perjury:

1.      I am the wife of the Petitioner-Plaintiff Vadim Pavlotskiy.

2.      Vadim and I met 12 years ago and resided together in civil union until we were

married. I have three children from my previous marriage, who Vadim has accepted and provides

for as his own.

3.      During our marriage I attended Nursing School and became a Registered Nurse.

Currently, I am in school to become a Family Nurse Practitioner.

4.      Throughout the entire period of 12 years, Vadim has been a great provider and takes

care of me and the children completely, including all bills, expenses, and our needs.

5.      Unfortunately, our oldest son has been in and out of psychiatric facilities for several years. He also suffers from a drug addiction.

6.      Our second son suffers from an anti-social disorder and other emotional issues. He is also under care of mental health professionals.

7.      Our youngest child (daughter) and Vadim have an amazing relationship. They are very close, and he has become a full-fledged father figure in her life.

8.      I was advised by Vadim's counsel that he is subject to being detained at any time, despite the fact that the chance of his deportation is relatively low. I was also advised that he was previously detained and there is a final order of removal for him in effect, but it has yet to be executed.

9.      I respectfully submit that if Vadim was to be detained, our children and I would suffer irreparable harm in that:

    i.   I would be required to quit Nursing School and give up on my aspirations to become a Family Nurse Practitioner, since lack of support would require me to secure a second job to cover the costs of living.

    ii.  Our children would suffer from the fact that Vadim ensures that they receive proper medical care, which would be impossible as I am unequipped to deal with drug addiction and emotional issues associated with the special needs and mental health issues of my two sons.

10.     In addition to my concerns for my own well-being and that of my children, I have grave concerns about Vadim's medical issues, which [I believe] would be significantly aggravated while in custody.

11.     In addition to renal colic, kidney stones, and other issues. He suffers from severe Hypertension and Atrial Fibrillation for which he was hospitalized. Even the stress of attending a check-in at an ICE facility two weeks ago, caused him to suffer from severe chest pains and he ended up in a hospital.

12.    Based on the aforementioned, I respectfully request that this Honorable Court grant

Mr. Pavlotskiy's application for a Temporary Restraining Order and subsequent Injunction from

being needlessly re-detained.

_____

Zhannetta Pavlotskiy


Sworn to before me on this
19th day of August 2025


_____

Notary Public

**MARK MOYSE**
NOTARY PUBLIC, State of New York
No. 01MO6022969
Qualified in Kings County
Commission Expires April 19, 20 27

Exhibit D

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

```
---------------------------------------------------------------x
```
VADIM PAVLOTSKIY,                                    :
                                                     :
         Petitioner-Plaintiff,                  :
                                                     :
         - vs -                                :
                                                     :    **AFFDAVIT OF PARENT**
WILLIAM JOYCE, Acting Field Office                   :    **EDUARD PAVLOTSKIY**
Director of the New York Immigration and             :
Customs Enforcement Office,                           :    Docket No.:
                                                     :
TODD LYONS, Acting Director of United                :
States Immigration and Customs Enforcement,          :
                                                     :
KRISTI NOEM, Secretary of the United                 :
States Department of Homeland Security,              :
                                                     :
PAM BONDI, Attorney General of the United            :
States,                                              :
                                                     :
         Respondents-Defendants.                :
```
---------------------------------------------------------------x
```

       Eduard Pavlotskiy, deponent over the age of 18 and a resident of Brooklyn NY, deposes and says under the penalty of perjury:

       13.    I am the father of the Petitioner-Plaintiff Vadim Pavlotskiy.

       14.    I respectfully submit this affidavit in support of the Mr. Pavlotskiy's application for the relief that he seeks.

       15.    My wife Lilia Pavlotskaya and I are retired. Despite working and paying taxes our entire lives, the Pension that we receive is insufficient to sustain us through our golden years.

       16.    Our son Vadim Pavlotskiy who is the Petitioner-Plaintiff in this action provides us with financial support on regular basis.

17.    He covers costs of our mortgage payments as well as provides for travel costs when needed.

18.    His financial support is instrumental for our existence and without it we would be forced to sell our home.

19.    Additionally, as we are getting older [I am 85 years old, my wife is 78 years old] we require more and more assistance with basic needs such as shopping, cleaning, transportation, etc.

20.    Without Vadim's assistance we would have no ability to commute or attend to our basic needs.

21.    I was advised by Vadim's counsel that he is subject to being detained at any time, despite the fact that the chance of his deportation is relatively low. I was also advised that he was previously detained and there is a final order of removal for him in effect, but it has yet to be executed.

22.    I respectfully submit that if Vadim was to be detained this would be devastating to us as parents of our only son and as elderly retirees that require financial as well as physical assistance.

23.    Based on the aforementioned, I respectfully request that this Honorable Court grant Mr. Pavlotskiy's application for a Temporary Restraining Order and subsequent Injunction from being needlessly re-detained.

_E. Pavlotskiy_
Eduard Pavlotskiy

Sworn to before me on this
19th day of August 2025

_____
Notary Public

**MARK MOYSE**
NOTARY PUBLIC, State of New York
No. 01MO6022969
Qualified in Kings County
Commission Expires April 19, 20 2 7

Exhibit E

**New York Community Hospital**

2525 Kings Highway, Brooklyn, NY 11229

(718) 692-5300

Printed 03/10/2017 15:41

| Patient Name | Age | DOB | Gender | Race | Admitting Weight | Admitting Height | Medical Record | Account |
|---|---|---|---|---|---|---|---|---|
| PAVLOTSKIY, VADIM | 44 yrs | 04/28/1972 | Male | White | 155.58kg | 185.42cm | 678833 | 417961969 |

**Insurance** OXFORD FREEDOM HMO/POS    **Reg. Date** 01/08/2017 12:35    **Adm. Date** 01/08/2017 16:15    **Room** 2F:249-B

**Allergies** No Known Drug Allergies

# Patient Demographics

## Admission Data

| Account Number | Medical Record | Admit Date | Admit Time | EMR MD | Primary Care MD | Admit Clerk |
|---|---|---|---|---|---|---|
| 417961969 | 678833 | 01/08/2017 | 16:15 | STOLYAR, EDWARD MD | | HIM, TEST ACCOUNT |

Reason For Visit: _____    MN Visit Dx: _____

Other Doctors: STOLYAR,EDWARD

Comments: APF

## Patient Data

| Patient Name | Date Of Birth | Social Security | Race | Sex | Religion | Marital | Maiden Name | Patient Email |
|---|---|---|---|---|---|---|---|---|
| PAVLOTSKIY, VADIM | 04/28/1972 | xxx-xx-9921 | White | M | XXX | S | U | 678833@NYCHINFO.COM |

Address 1: 726 JERALD COURT

Address 2:

City: BROOKLYN    State: NY    Zip: 11235    Phone: (347)331-1595

Employer: _____    Occupation: _____

Address 1:

Address 2:

City: _____    State: _____    Zip: _____    Phone: _____

## Insurance Data

| Insurance Name | Subscriber | Subscriber Relationship | Policy Number | Group Number | Fin Class | Auth Number |
|---|---|---|---|---|---|---|
| OXFORD FREEDOM HMO/POS | PAVLOTSKIY, VADIM | 4 | -980850102- | | T08 | 109245534 |

Address 1: PO BOX 29130

Address 2:

City: HOT SPRINGS    State: AR    Zip: 71903    Phone: _____

| Insurance Name | Subscriber | Subscriber Relationship | Policy Number | Group Number | Fin Class | Auth Number |
|---|---|---|---|---|---|---|
| SELF-PAY | PAVLOTSKIY, VADIM | 4 | | | T08 | |

Address 1:

Address 2:

City: _____    State: _____    Zip: _____    Phone: _____

## Person To Notify Data

| Name | Relationship |
|---|---|
| PYATESTSKY, ROMAN | OTHER |

Address 1: 726 JERALD COURT

Address 2:

City: BROOKLYN    State: NY    Zip: 11235    Phone: (347)348-6076    Business Phone: _____

| Name | Relationship |
|---|---|
| PYATESTSKY, ROMAN | OTHER |

Address 1: 726 JERALD COURT

Address 2:

City: BROOKLYN    State: NY    Zip: 11235    Phone: (347)348-6076    Business Phone: _____

## Guarantor Data

| Name | Relationship | Social Security | Employer | Occupation |
|---|---|---|---|---|
| PAVLOTSKIY, VADIM | 4 | xxx-xx-9921 | | |

Address 1: 726 JERALD COURT

Address 2:

City: BROOKLYN    State: NY    Zip: 11235    Phone: (347)331-1595    Business Phone: _____

## New York Community Hospital

2525 Kings Highway, Brooklyn, NY  11229
(718) 692-5300

Printed  03/10/2017 15:41

| Patient Name | | Age | DOB | Gender | Race | | Admitting Weight | Admitting Height | Medical Record | Account |
|---|---|---|---|---|---|---|---|---|---|---|
| PAVLOTSKIY, VADIM | | 44 yrs | 04/28/1972 | Male | White | | 155.58kg | 185.42cm | 678833 | 417961969 |

**Insurance**   OXFORD FREEDOM HMO/POS

**Reg. Date**  01/08/2017 12:35   **Adm. Date**  01/08/2017 16:15   **Room**  2F:249-B

**Allergies**   No Known Drug Allergies

### Next Of Kin Data

| Name | | Relationship | |
|---|---|---|---|
| PYATESTSKY, ROMAN | | OTHER | |

Address 1   726 JERALD COURT

Address 2

| City | BROOKLYN | State | NY | Zip | 11235 | Phone | (347)348-6076 | Business Phone | |
|---|---|---|---|---|---|---|---|---|---|

| Name | | Relationship | |
|---|---|---|---|
| PYATESTSKY, ROMAN | | OTHER | |

Address 1   726 JERALD COURT

Address 2

| City | BROOKLYN | State | NY | Zip | 11235 | Phone | (347)348-6076 | Business Phone | |
|---|---|---|---|---|---|---|---|---|---|

## New York Community Hospital

3535 Kings Highway, Brooklyn NY 11223
(718) 692-5300                                    Printed: 01/12/2017 11:47

| Patient Name | Age | DOB | Gender | Race |
|---|---|---|---|---|
| PAVLOTSKIY, VADIM | 44 yrs | 04/26/1972 | Male | White |

Allergies: No Known Drug Allergies

| Insurance | Admitting Weight | Admitting Height | Medical Record | Account |
|---|---|---|---|---|
| OXFORD FREEDOM | 155.58 kg | 185.42 cm | 678533 | 417961959 |

Reg. Date 01/08/2017 12:35        Room 202210-a
Adm. Date 01/08/2017 16:15

# Discharge-Home Instructions

### Discharge Diagnosis

Anabolic steroids adverse reaction (disorder)

Anxiety (finding)

Atrial fibrillation (disorder)

Benign essential hypertension (disorder)

Community acquired pneumonia (disorder)

Dyspnea (finding)

Hypertensive disorder, systemic arterial (disorder)

Hypoxemia (disorder)

### Discharge Activity
Activity As Tolerated

### Discharge Diet
Low Salt Diet

### Discharge Instructions
LEFT ATRIAL APPENDAGE THROMBUS s/p TRANSESOPHAGEAL ECHOCARDIOGRAM (TEE) 1/11/17

### Discharge Prewritten Instructions

Atrial Fibrillation

Anticoagulation Generic

| Follow Up Date/Time | Practitioner Name | Clinic Name | Address | City | State | Zip | Phone |
|---|---|---|---|---|---|---|---|
| | Stolyar, Edward | SEAGATE MEDICA | 2094 Coney Ave 1G | Brooklyn | NY | 11235 | 718-975-0765 |
| Comments | Follow up with your PCP | | | | | | |
| | Randassoon, Keshwah | | 2523 Kings Highway | Brooklyn | NY | 11229 | 718-332-9000 |
| Comments | Follow up with cardiology | | | | | | |
| | Rubin, Aaron | | 560 Brighton Beach Ct. B-8 | Brooklyn | NY | 11235 | 718-332-1064 |
| Comments | Follow up with pulmonary | | | | | | |

### Prescriptions

Rx   Blood Pressure Test Kit-Large Cuff, Patient Instructions: 1 APPLIC        Refills: 0
by Misc (Non-Drug) Combo Route) route twice a day        Qty 1 Bo

Rx   Metoprolol Tartrate (Lopressor) 100 mg Tab, Patient Instructions:        Refills: 0
take 1 tablet (100 MG) by oral route 2 times per day        Qty 14 Ta

Doxycycline 100 mg Cap, Patient Instructions: take 1 capsule (100        Refills: 0
MG) by oral route 2 times per day for 5 day(s)        Qty 10 Ca

1 of 2

New York Community Hospital

| Patient Name | Age | DOB | Gender | Race | Insurance | Weight | Height | Medical Record | Account |
|---|---|---|---|---|---|---|---|---|---|
| PAVLOTSKIY, VADIM | 44 yrs | 04/28/1972 | Male | White | OXFORD FREEDOM HMO-POS | 155.58kg | 185.42cm | 675633 | 41286185 |

Admitting Weight / Admitting Height

Allergies: No Known Drug Allergies

Reg. Date  01/08/2017 12:35    Room  2F-245 B
Adm. Date  01/08/2017 16:15

# Discharge-Home Instructions

Rx: Eliquis 5 mg tablet, Patient Instructions: take 1 tablet(5 MG) by oral route 2 times per day    Refills 0    Qty 20 Ta

| Print Date/Time: | 1/12/2017 11:42:06 AM |
| Discharge Date/Time: | 1/8/2017 3:46:00 PM |
| Attending Physician: | STOLYAR, EDWARD |
| Language: | English |

Received transitional record: Diagnosis, Diagnostic Results, Procedures, Follow-up/Patient Instructions, and Home Medication List

All patients must follow up with a doctor within 48 hours if there are still medical symptoms or problems

Nurse Signature:

Patient Signature:

X V Pavlotskiy



517 Océan View Avenue, Brooklyn, NY 11235
**Tel:** 718-934-5559 | **Fax:** 718-934-6137

Patient Name: **Pavlotskiy, Vadim**

Patient Number: **8744183**

Date: **7/25/2025**

Date Of Birth: **4/28/1972**

## INITIAL UROLOGY OFFICE VISIT

**Reason for Referral/Consultation:**
Patient 63 Y.O. Male with Right Flank/ Right Upper abdominal Pain, Dysuria, Nausea, started 07/20/2025. Pain increased in intensity for the past 2 days.
Patient has a history of Kidney Stones, Prostatitis.

**Primary Diagnosis**

| Date | Type | ICD-9 | ICD-10 | Description | Disease Status | Status Date |
|------|------|-------|--------|-------------|----------------|-------------|
| 7/25/2025 | Primary | 592.0 | N20.0 | Calculus of kidney | | |
| 7/25/2025 | Primary | 789.01 | R10.11 | Right upper quadrant pain | | |
| 7/25/2025 | Primary | 788.0 | N23 | Unspecified renal colic | | |
| 7/25/2025 | Primary | 601.1 | N41.1 | Chronic prostatitis | | |
| 7/25/2025 | Primary | 593.2 | N28.1 | Cyst of kidney, acquired | | |
| 7/25/2025 | Primary | 591 | N13.30 | Unspecified hydronephrosis | | |

**History of Present Illness**
Right Flank/ Right Upper abdominal Pain, Nausea, started 07/20/2025. Pain increased in intensity for the past 2 days.

**Past Medical History**
CAD (**Cardioversion 2018**), Obesity, Uncontrolled HTN, Sleep apnea, Fatty liver,

| Date | Type | ICD-9 | ICD-10 | Problem | Comment | Status |
|------|------|-------|--------|---------|---------|--------|
| 7/25/2025 | Diagnosis | 788.0 | N23 | Unspecified renal colic | | Active |

**Allergies**
No Known Allergies

**Medications**

**Family History**
Colon CA-father
Skin CA-Mother

Tobacco Use and Cessation Counseling

| Result | Value | Units | Range | Comment |
|--------|-------|-------|-------|---------|
| Protein | 30 | mg/dL | | |
| Bilirubin (UA) | Negative | | | |
| Sp Gravity | 1.020 | | 1-1.03 | |
| Blood | Negative | | | |
| ph | 6.0 | | 5-9 | |
| Glucose (urine) | Negative | mg/dL | | |
| Ketone# | Negative | mg/dL | | |
| Urobil | 1.0 | E.U./dL | 0.2-1.9 | |
| Nitrite | Negative | | | |
| Leuk | Negative | | | |
| Appearance | Clear | | | |
| Color | Yellow | | | |

Lab results on 7/25/2025: Protein=30 mg/dL, Bilirubin (UA)=Negative , Sp Gravity=1.020 , Blood=Negative , ph=6.0 , Glucose (urine)=Negative mg/dL, Ketone#=Negative mg/dL, Urobil=1.0 E.U./dL, Nitrite=Negative , Leuk=Negative , Appearance=Clear , Color=Yellow

**Imaging Results**

| Print? | Date of Doc. | Name | MD Interpretation | Comment |
|--------|--------------|------|-------------------|---------|
| ☑ | 7/25/2025 | Ultrasound - Retroperi Compl. (Renal | | |

**Discussion:**
- I personally reviewed radiology images

**Plan**
- Return for follow up in 3 months.

**Ordering UTI PCR for the following indication(s):**
Lithotripsy;
**Urine testing indicated to rule out occult urinary tract infection as part of medical clearance prior to planned procedure(s) involving GU instrumentation; procedures include but are NOT limited to the following:**
Presence of urinary tract stones;

**Assessment/Plan**
Plan: Cystoscopy, Right Laser Ureterolithotripsy, Right JJ-stent placement.

**G2211 Documentation:**
Today's office visit included management of the patient's chronic urological conditions and issues, including___Renal colic____. As the patient's primary urology provider, we have cultivated a relationship to treat their urologic health comprehensively. We also address and treat acute urologic problems, taking into account their overall urologic health, condition, and history. This involves significant care coordination, ordering tests or imaging, adjustments to medication regimens, and extensive patient counseling.

**NY Health Urology**

517 Ocean View Ave
Brooklyn, NY 11235
631-663-4850

Vadim Pavlotskiy
DOB: 4/28/1972, 53 years
MRN: 8744183-ONCO
Exam Date: 7/25/2025
**Report finalized**

## Renal & Bladder

Indication
Renal calcifications/stones

Method
The Kidneys and bladder were evaluated in longitudinal and transverse using 3.5-5 Mhz abdominal probe. Transverse images were obtained in the superior, mid, and inferior portions of the kidneys. Longitudinal views were obtained centrally as well as medially and laterally. Each kidney was evaluated in its entirety. The size, echogenicity, and blood flow of each kidneys was compared to the contralateral side. Renal echogenicity was compared to the adjacent liver or spleen. Doppler of the kidneys were performed for patency. Pre and post void bladder images were taken.

Abdominal Aorta
Normal, 2.0 cm.

Inferior Vena Cava
Normal, 1.3 cm.

Right Kidney
Length 14.7 cm. Width 6.3 cm. Height 6.3 cm. Volume 305.5 cm³
Normal size, shape, and renal parenchyma. No masses visualized. Renal cysts and stones visualized.
Cyst with internal septation: UP=3.6x2.2 cm
Mild hydronehprosis : UP-??
Kidney stone: UP=0.4cm, MP=0.3cm

Left Kidney
Length 14.2 cm. Width 7.5 cm. Height 7.0 cm. Volume 390.3 cm³
Normal size, shape. Abnormal renal parenchyma ( Column of Bertin). No hydro, cysts or masses visualized. Renal stones visualized.
Kidney stone: MP=0.4cm, MP=0.3cm, UP=0.4cm, LP=0.3cm

Renal Arteries
**Right Kidney Arteries:**

|         | PS cm/s |
|---------|---------|
| Renal A | 32      |









Vladimir Krichevsky, MD
Reading physician

Vladimir Krichevsky, MD
Ordering Physician

Nataliia Soroka
Sonographer

Exhibit F

*ESR* PAVLOTSKIY VADIM
DO. FLYNN A071 078 382
(212) 264-5855

Department of Justice
Immigration and Naturalization Service

# Order of Supervision

File No:  A71 078 382

Date:  09/10/2008

Name:  PAVLOTSKIY, Vadim

On  06/03/2008 , you were ordered:
(Date of final order)

☐ Excluded or deported pursuant to proceedings commenced prior to April 1, 1997.

☒ Removed pursuant to proceedings commenced on or after April 1, 1997.

Because the Service has not affected your deportation or removal during the period prescribed by law, it is ordered that you be placed under supervision and permitted to be at large under the following conditions:

☒ That you appear in person at the time and place specified, upon each and every request of the Service, for deportation or removal.

☒ That upon request of the Service, you appear for medical or psychiatric examination at the expense of the United States Government.

☒ That you provide information under oath about your nationality, circumstances, habits, associations, and activities and such other information as the Service considers appropriate.

☒ That you do not travel outside  New York  for more than 48 hours without first having notified this Service office of the dates and places of such proposed travel.

☒ That you furnish written notice to this Service office of any change of residence or employment within 48 hours of such change.

☒ That you report in person on the  15th  day of  September, 2008  to this Service office at:
26 Federal Plaza  New York, NY  10278  (212)264-5085

☒ That you assist the Immigration and Naturalization Service in obtaining any necessary travel documents.

☒ Other:  Must comply with all conditions of the ESR program

☒ See attached sheet containing other specified conditions (Continue on separate sheet if required

Joseph P. Laws
(Signature of INS official)

Deportation Officer
(Print name and title of INS official)

---

## Alien's Acknowledgment of Conditions of Release under an Order of Supervision

I hereby acknowledge that I have (read)(had interpreted and explained to me in the  English  language)
the contents of this order, a copy of which has been given to me. I understand that failure to comply with the terms of this order may subject me to a fine, detention, or prosecution.

(Signature of INS official serving order)

x V. Pavlotskiy
(Signature of alien)

9/10/08
(Date)

Form I-220B(Rev.4/1/97)N

SD

07/30/2008    11:26    2155225564    GE    PAGE    03/03

# U.S. Department of Homeland Security
## Immigration and Customs Enforcement

**Warning for Failure to Depart**

| Name: | District Office: | File #: |
|---|---|---|
| PAVLOTSKIY, Vadim | DET | 71 078 382 |

Section 243(a) of the Immigration and Nationality Act provides, in part, that:

Any alien against whom a final order of removal is outstanding by reason of being a member of any of the classes described in section 237(a) who--

(A)    willfully fails or refuses to depart from the United States within a period of 90 days* from the date of the final order of removal under administrative processes, or if judicial review is had, then from the date of the final order of the court,

(B)    willfully fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure,

(C)    connives or conspires, or takes any other action, designed to prevent or hamper or with the purpose of preventing or hampering the alien's departure pursuant to such, or

(D)    willfully fails or refuses to present himself or herself for removal at the time and place required by the Attorney General pursuant to such order,

shall be fined under title 18, United States Code, or imprisoned not more than four years (or 10 years if the alien is a member of any of the classes described in paragraph (1)(E), (2), (3), or (4) of section 237(a)), or both.

Nothing in this section shall make it a violation to take proper steps for the purpose of securing cancellation of or exemption from such order of removal or for the purpose of securing the alien's release from incarceration or custody.

Any action the Immigration and Naturalization Service may take to obtain a travel document for your departure or to remove you will *NOT* relieve you of the liability for compliance with the provisions of law referred to in the first paragraph above.

*    Section 241(a)(1)(C) provides for the extension of the statutory removal period if the alien refuses, during the removal period, to make application in good faith, for a travel or other document necessary for the alien's removal or departure or conspires or acts to preve the alien's removal subject to an order of removal.

| Date Order Final: | Ordered Removed under Section: |
|---|---|
| 8/3/2008 | 237(a)(2)(A)(iii) , 237 (a)(2)(B)(i) |

## Record of Service
### (Check method used)

## Record of Personal Service

| ☒ Served By: (Print Name and Title of Officer) | | Date: 7/30/08 |
|---|---|---|
| KEVIN Hardy          IEA | | |
| Officer's Signature: | Location of Service: Tiffin, Ohio | Date: 7/30/08 |
| Served On: (Alien's Signature) V. Pavlotskiy | | |

### Warning administered in Court
(Copy of order attached)

### Certified Mail Service

**Attach certified mail receipts here.**

**Record of Personal Service (Cont.)**

Fingerprint of Alien  (Specify finger used)

Form I-229(a)
(Revised 12/04/02)

## Outprocessing Checklist

A# 71 078 382

### Sex Offenders

☐ Probation/Parole Officer notified.

☐ Registered as sex-offender as required by state statute within 7 days.

☐ Victim/Witness Coordinator notified.

☐ Victim/Witness notified.

☐ Written Proof of Counseling.

### Substance Abusers

☐ Probation/Parole Officer notified.

☐ Written Proof of Counseling.

### All Aliens

☒ Parole/Probation Officer notified.

☒ Obtain address where living and telephone number.

☒ Enter into IDENT

☒ NCIC check

☒ Travel document application

Completed By:

_Joseph Kanns_                                        9-10-08

**Deportation Officer**                              **Date**

Concurrence By:

_____

**Supervisory Deportation Officer**              **Date**

## Outprocessing Checklist

A# 71 078 382

Sex Offenders

☐ Probation/Parole Officer notified.

☐ Registered as sex-offender as required by state statute within 7 days.

☐ Victim/Witness Coordinator notified.

☐ Victim/Witness notified.

☐ Written Proof of Counseling.

Substance Abusers

☐ Probation/Parole Officer notified.

☐ Written Proof of Counseling.

All Aliens

☒ Parole/Probation Officer notified.

☒ Obtain address where living and telephone number.

☒ Enter into IDENT

☒ NCIC check

☒ Travel document application

Completed By:

_____            9-10-08

**Deportation Officer**                                              **Date**

Concurrence By:

_____

**Supervisory Deportation Officer**                    **Date**



*Office of Detention and Removal Operations*
*Detroit Field Officer*

**U.S. Department of Homeland Security**
1240 E. 9th St. Suite 535
Cleveland, Ohio 44111

## U.S. Immigration and Customs Enforcement

Vadim PAVLOTSKIY                                    A71 078 382
C/O Seneca County Detention Center
3040 South State Route 100
Tiffin, Ohio 44883

### Release Notification

Upon review of your case, U.S. Immigration and Customs Enforcement (ICE) has concluded that you may be released from ICE custody pending your removal from the United States. This release does not affect your removal order and does not constitute an admission to the United States.

Your release will be subject to certain written conditions that will be provided to you shortly on the Order of Supervision and Addendum to the Order of Supervision forms, and by which you must abide. A violation of one or more of these conditions, or of any local, state or federal law may result in your being taken back into custody and any bond that you may have posted being forfeited. Your release from custody is also conditioned upon your maintaining proper behavior while sponsorship and placement efforts for you are being undertaken.

Prior to your release from custody, an immigration officer may verify the sponsorship or employment offers presented during your review. Please forward any additional information regarding potential sponsoring family members or non-governmental organizations that may be willing to assist you upon release.

It is particularly important that you keep ICE advised of your address at all times. ICE will continue to make efforts to obtain your travel document that will allow the United States government to carry out your removal pursuant to your order of deportation, exclusion, or removal. In addition, you are required by law to continue to make good faith efforts to secure a travel document on your own and provide proof of your efforts to ICE. Once a travel document is obtained, you will be required to surrender to ICE for removal. You will, at that time, be given an opportunity to prepare for an orderly departure.

_____                    9/4/08
Signature of  Acting Deputy Field Office Director                    Date

(rev. 1/26/05)



Exhibit G

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| ARNOLDO RODRIGUEZ DIAZ, | Case No. 3:25-cv-05071 |
| Petitioner-Plaintiff, | |
| v. | **ORDER GRANTING *EX PARTE* TEMPORARY RESTRAINING ORDER; AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE** |
| POLLY KAISER, Acting Field Office Director of San Francisco Office of Detention and Removal, U.S. Immigrations and Customs Enforcement, U.S. Department of Homeland Security, et al., | [Re: Dkt. No. 2] |
| Respondents-Defendants. | |

Before the Court is Petitioner-Plaintiff Arnoldo Rodriguez Diaz's *Ex Parte* Motion for Temporary Restraining Order. Dkt. No. 2 ("Mot."). Petitioner-Plaintiff simultaneously filed his Petition for Writ of Habeas Corpus and *Ex Parte* Motion for Temporary Restraining Order against Respondents-Defendants Acting Field Office Director Polly Kaiser, Acting Director of Immigration and Customs Enforcement Todd M. Lyons, Secretary of the Department of Homeland Security Kristi Noem, and United States Attorney General Pam Bondi on June 14, 2025, seeking an order temporarily enjoining the Department of Homeland Security ("DHS"), their agents, employees, and successors in office from re-detaining him until such time as he has had an opportunity to challenge his re-detention before a neutral decisionmaker. *Id.* at 1. Petitioner-Plaintiff states that he was released from immigration custody five years ago, but fears that there is a substantial and immediate risk that he will be re-detained at an in-person

1    Immigration and Customs Enforcement ("ICE") check-in appointment this weekend. *Id.*

2         For the following reasons, the Court GRANTS Petitioner-Plaintiff's *Ex Parte* Motion for

3    Temporary Restraining Order.

4    **I.    BACKGROUND**

5         Petitioner-Plaintiff was born in El Salvador and has lived in the United States since he was

6    nine years old. Dkt. No. 1 ("Petition") ¶ 24. DHS initiated removal proceedings against him

7    when he was fifteen years old. *Id.* ¶ 30. Petitioner-Plaintiff was arrested in 2018 and pled guilty

8    to domestic violence charges. *Id.* ¶ 33. He was taken into custody by ICE upon completion of his

9    sentence. *Id.* Petitioner-Plaintiff was incarcerated by DHS for seventeen months between 2019

10   and 2020 pending resolution of his immigration case. *Id.* ¶ 2. DHS released him on a $10,000

11   bond in May 2020 pursuant to an order of District Judge Yvonne Gonzalez Rogers. *Id.* DHS

12   installed an electronic ankle monitor and enrolled Petitioner-Plaintiff in the Intensive Supervision

13   Appearance Program ("ISAP"). *Id.* DHS removed the ankle monitor in April 2022. *Id.*

14        Petitioner-Plaintiff has been out of custody for five years, during which time he has been

15   the sole caretaker for his minor U.S. citizen son, and he recently became the father of a newborn

16   U.S. citizen daughter. Petition ¶¶ 2-3. Petitioner-Plaintiff has complied with all conditions of

17   release. *Id.* ¶ 2. His most recent check-in appointment with ICE was on May 31, 2024 and he has

18   another appointment on June 30, 2025. *Id.* ¶ 4. *Id.* Petitioner-Plaintiff has several pending

19   applications for relief for removal, including a pending asylum application that is scheduled for a

20   Master Calendar Hearing before the San Francisco Immigration Court on August 19, 2026. *Id.* ¶

21   24.

22        On Friday, June 13, 2025, Petitioner-Plaintiff received a message on his telephone from

23   ISAP directing him to report to the San Francisco ISAP Office in person on either Saturday, June

24   14, 2025 or Sunday, June 15, 2025. Petition ¶ 5. No reason was given. *Id.* Petitioner-Plaintiff's

25   counsel attempted to call ISAP three times, and each time counsel was placed on hold before the

26   call was disconnected. *Id.* Petitioner-Plaintiff's counsel also tried calling and emailing the San

27   Francisco ICE Office to seek clarification, but received no response. *Id.* Petitioner-Plaintiff is

28   aware that other non-citizens have received similar messages to report from ISAP, and that many

of those individuals were incarcerated or re-incarcerated when they complied. *Id.* ¶¶ 6-9.

Petitioner-Plaintiff filed the present Petition for a Writ of Habeas Corpus and *Ex Parte* Motion for a Temporary Restraining Order on June 14, 2025, seeking to enjoin Respondents-Defendants from re-detaining him at his in-person check-in with immigration authorities.

## II.  LEGAL STANDARD

The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction. *See Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) ("[T]he legal standards applicable to TROs and preliminary injunctions are substantially identical." (internal quotation marks and citation omitted)).  An injunction is a matter of equitable discretion and is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008).  And "a TRO 'should be restricted to . . . preserving the status quo and preventing irreparable harm just so long as is necessary to hold a [preliminary injunction] hearing and no longer.'" *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018) (quoting *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974)).

A plaintiff seeking preliminary injunctive relief must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20.  "[I]f a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014) (internal quotation marks and citations omitted).  "[W]hen the Government is the opposing party," the final two factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## III.  DISCUSSION

As a preliminary matter, the Court finds that the requirements for issuing a temporary restraining order without notice set out in Federal Rule of Civil Procedure 65(b)(1) are met in this

1   case. Petitioner-Plaintiff's attorney has set out specific facts showing that "immediate and

2   irreparable injury, loss, or damage" may result before the adverse party can be heard in opposition

3   and has stated that counsel attempted to contact the Civil Division Chief at the U.S. Attorney's

4   Office for the Northern District of California on Friday, June 13, 2025 regarding the forthcoming

5   Habeas Petition and Motion for Temporary Restraining Order. *See* Dkt. No. 2-2, Sinodis Decl. Re

6   Notice ¶¶ 3-5.

7         The Court finds that Petitioner-Plaintiff has shown at least that there are "serious questions

8   going to the merits" and that "the balance of hardships tips sharply" in his favor. *Weber*, 767 F.3d

9   at 942. Under the Due Process Clause of the Fifth Amendment to the United States Constitution,

10   no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const.

11   amend. V. "Freedom from imprisonment—from government custody, detention, or other forms of

12   physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas v. Davis*, 533

13   U.S. 678, 690 (2001) (citing *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)). Courts have

14   previously found that individuals released from immigration custody on bond have a protectable

15   liberty interest in remaining out of custody on bond. *See Ortiz Vargas v. Jennings*, No. 20-cv-

16   5785, 2020 WL 5074312, at *3 (N.D. Cal. Aug. 23, 2020); *Ortega v. Bonnar*, 415 F. Supp. 3d

17   963, 969 (N.D. Cal. 2019) ("Just as people on preparole, parole, and probation status have a

18   liberty interest, so too does Ortega have a liberty interest in remaining out of custody on bond.");

19   *Romero v. Kaiser*, No. 22-cv-02508, 2022 WL 1443250, at *2 (N.D. Cal. May 6, 2022) ("[T]his

20   Court joins other courts of this district facing facts similar to the present case and finds Petitioner

21   raised serious questions going to the merits of his claim that due process requires a hearing before

22   an IJ prior to re-detention."); *Jorge M. F. v. Wilkinson*, No. 21-cv-01434, 2021 WL 783561, at *2

23   (N.D. Cal. Mar. 1, 2021).

24         For similar reasons as those discussed in the aforementioned cases, this Court finds that the

25   three factors relevant to the due process inquiry set out in *Mathews v. Eldridge*, 424 U.S. 319

26   (1976)—"the private interest that will be affected by the official action," "the risk of an erroneous

27   deprivation . . . and the probable value, if any, of additional or substitute procedural safeguards,"

28   and "the Government's interest, including the function involved and the fiscal and administrative

burdens that the additional or substitute procedural requirement would entail," *id.* at 335—support requiring a pre-detention hearing for Petitioner-Plaintiff. Petitioner-Plaintiff has a substantial private interest in remaining out of custody on bond, which "enables him to do a wide range of things open to persons" who are free from custody, such as working, living at home, and "be[ing] with family and friends . . . to form the enduring attachments of normal life." *See* Mot. at 10; *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972). There is also a risk of erroneous deprivation that the additional procedural safeguard of a pre-detention hearing would help protect against. And, like other Courts in this district, the Court concludes that the government's interest in re-detaining Petitioner-Plaintiff without a hearing is "low," particularly in light of the fact that Petitioner-Plaintiff has long complied with his reporting requirements. *See Jorge M.F.*, 2021 WL 783561, at *3; *Ortega*, 415 F. Supp. 3d at 970.

Petitioner-Plaintiff is also likely to suffer immediate and irreparable harm in the absence of preliminary relief. The Ninth Circuit has recognized "irreparable harms imposed on anyone subject to immigration detention" including "the economic burdens imposed on detainees and their families as a result of detention, and the collateral harms to children of detainees whose parents are detained." *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017). Both risks are present here, where Petitioner-Plaintiff has two minor children, one a newborn, who depend upon him for support. Dkt. No. 2-1, Sinodis Decl. ¶ 9. In addition, "[i]t is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

Finally, the balance of the equities and the public interest, which merge in light of the fact that the government is the opposing party, tip sharply in Petitioner-Plaintiff's favor. "[T]he public has a strong interest in upholding procedural protections against unlawful detention, and the Ninth Circuit has recognized that the costs to the public of immigration detention are staggering." *Jorge M. F.*, 2021 WL 783561, at *3 (cleaned up) (quoting *Ortiz Vargas*, 2020 WL 5074312, at *4, and then quoting *Hernandez*, 872 F.3d at 996); *see also Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution."). Without the

1   requested injunctive relief, Petitioner-Plaintiff might be abruptly taken into ICE custody,

2   subjecting both him and his family to significant hardship. *See* Mot. at 13. Yet the comparative

3   harm potentially imposed on Respondents-Defendants is minimal—a mere short delay in detaining

4   Petitioner-Plaintiff, should the government ultimately show that detention is intended and

5   warranted. Moreover, a party "cannot reasonably assert that it is harmed in any legally cognizable

6   sense by being enjoined from constitutional violations." *Zepeda v. U.S. Immigr. & Nat. Serv.*, 753

7   F.2d 719, 727 (9th Cir. 1983).

8       Accordingly, the Court hereby GRANTS Petitioner-Plaintiff's Motion for a Temporary

9   Restraining Order. Under Federal Rule of Civil Procedure 65, a court "may issue a preliminary

10  injunction or a temporary restraining order only if the movant gives security in an amount that the

11  court considers proper to pay the costs and damages sustained by any party found to have been

12  wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The rule "invests the district court

13  'with discretion as to the amount of security required, if any,'" and the court "may dispense with

14  the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from

15  enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (quoting

16  *Barahona–Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999)). In this case, in light of the

17  minimal risk of harm to the government, the Court determines that security is not required.

18  **IV.   ORDER**

19      For the foregoing reasons, IT IS HEREBY ORDERED that Petitioner-Plaintiff's *Ex Parte*

20  Motion for Temporary Restraining Order is GRANTED to preserve the status quo pending further

21  briefing and a hearing on this matter. Respondents-Defendants are ENJOINED AND

22  RESTRAINED from re-detaining Petitioner-Plaintiff without notice and a hearing. This Order

23  shall remain in effect until Monday, June 23, 2025 at 5:00 p.m. The Petition for Writ of Habeas

24  Corpus, Motion for Temporary Restraining Order, and this Order SHALL be served on

25  Respondents-Defendants such that they receive actual notice by no later than Monday, June 16,

26  2025 at 2:00 p.m.

27      Respondents-Defendants are ORDERED TO SHOW CAUSE in-person at a hearing in the

28  courtroom of the assigned Judge, or as otherwise ordered by that Judge, on **Monday, June 23,**

1    **2025 at 1:00 p.m.** why a preliminary injunction should not issue.  Respondents-Defendants shall

2    file a response to Petitioner-Plaintiff's motion by no later than Wednesday, June 18, 2025 at 5:00

3    p.m.  No reply shall be filed.

4

5        **IT IS SO ORDERED.**

6

7    Dated:  June 14, 2025 at 3:40 p.m.

8                                                    BETH LABSON FREEMAN, as Duty Judge

9                                                    United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

2025 WL 1983677
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

GUILLERMO M. R., Petitioner,

v.

Polly KAISER, et al., Respondents.

Case No. 25-cv-05436-RFL
|
Signed July 17, 2025

**Attorneys and Law Firms**

Victoria Sun, Pangea Legal Services, San Francisco, CA, for
Petitioner.

**ORDER GRANTING PRELIMINARY INJUNCTION**

Re: Dkt. No. 2

RITA F. LIN, United States District Judge

**I. INTRODUCTION**

**\*1** More than two years ago, in March 2023, an
Immigration Judge ("IJ") released Petitioner Guillermo M.R.
from immigration detention after a hearing, based on a
determination that he did not pose a risk of flight or danger
to the community. In so holding, the IJ reached a different
conclusion than U.S. Immigration and Customs Enforcement
("ICE"), which had repeatedly rejected Petitioner's requests
for release.

Despite the IJ's ruling, on June 26, 2025, ICE told Petitioner
that it planned to detain him at his mandatory check-in five
days later. ICE contends that it may unilaterally determine that
Petitioner should be re-detained, regardless of whether there
has been any material change in circumstance since the IJ's
release decision. In ICE's view, Petitioner is not entitled to any
hearing in front of a neutral decisionmaker, either before his
re-detention or shortly afterwards, to evaluate whether ICE's
assessment is correct. Instead, according to ICE, Petitioner's
only recourse is to make an oral request for release to ICE
agents upon detention, and if that is not successful, to ask ICE
supervisors to reconsider his detention after three months and
again after six months. ICE notes that once Petitioner has been
detained for more than six months, a preliminary injunction
in another case may require a hearing before an IJ.

Petitioner has filed a petition for writ of habeas corpus,
alleging that his detention without a hearing before a neutral
decisionmaker would violate his constitutional right to due
process. Petitioner asks the Court to preliminarily enjoin
Respondents from re-detaining him before providing such a
hearing. Petitioner's motion is **GRANTED**, for the reasons
explained below.

The right to be free of incarceration is at the heart of the Due
Process Clause. The Supreme Court has therefore required, as
a general rule, a "hearing *before* the State deprives a person
of liberty." *Zinermon v. Burch*, 494 U.S. 113, 127, 110 S.Ct.
975, 108 L.Ed.2d 100 (1990) (emphasis in original). This
Court has been unable to identify any other context in which
government agents may unilaterally detain someone without
a hearing beforehand or immediately afterwards in front of a
neutral decisionmaker, when a judge has previously ordered
that person released. Even parolees—for whom detention is
the "default," who are subject to significant constraints on
liberty, and who continuing to serve their criminal sentences
while released on parole—may not be detained and put back in prison without a court
hearing within a few days. Nor may criminal defendants
who are released on bond be detained and put in jail
without a prompt hearing, no matter how serious their alleged
crimes. It is difficult to imagine any court blessing the
constitutionality of a system in which parolees or criminal
defendants would not receive any hearing before a judge
for more than *six months* after being re-detained following
their release, and were limited to asking law enforcement
supervisors to reconsider the detention. Yet, that is essentially
what Respondents propose here, even though participants in
civil immigration proceedings are supposed to receive greater
liberty protections than criminal defendants.

**\*2** There are serious questions, at the very least, as to
whether ICE may unilaterally deprive Petitioner of his
liberty without timely review from a neutral decisionmaker.
Petitioner has shown that the balance of hardships tips sharply
in his favor, and thus that issuance of a preliminary injunction
is appropriate.

**II. BACKGROUND**
Petitioner, who is 31 years old, asserts through counsel that
he was born in Mexico, and that he entered the United States
in 2000 or 2001 when he was approximately six years old.
(Dkt. No. 1-1 ¶ 5.) [1] He was the victim of prolonged domestic

violence at the hands of his stepfather, and developed PTSD, Generalized Anxiety Disorder ("GAD"), Major Depressive Disorder ("MDD"), and Insomnia. (*Id.* ¶¶ 5, 26.) Petitioner was convicted of attempted murder for a gang-related stabbing when he was 16, and was sentenced to thirteen years in prison. (*Id.* ¶ 6.) While he was incarcerated, Petitioner earned his high school diploma, and participated in programs including a victims impact group, group therapy, anger management, trauma recovery, and Bible studies. (*Id.* ¶ 7.)

1    All citations to page numbers refer to ECF pagination.

Upon his release from prison on December 9, 2021, Petitioner was immediately detained by ICE, and 19 days later ICE issued a Final Administrative Removal Order pursuant to 8 U.S.C. § 1231(a)(6) ("Removal Order"), finding that Petitioner was deportable due to an aggravated felony conviction. (*Id.* ¶ 8.) Subsequently, and while he was still detained, an IJ placed Petitioner into withholding of removal proceedings. (*Id.* ¶¶ 9–10.) Petitioner's application for withholding of removal was initially denied by an IJ and the decision was affirmed by the Board of Immigration Appeals ("BIA"), but has since been re-opened pursuant to a joint request by Petitioner and ICE, based on ICE's disclosure of Petitioner's personally identifiable asylum information on ICE's public website. (*Id.* ¶¶ 12, 16.) A hearing on the application was scheduled for January 31, 2028 (*id.* ¶ 23, p. 21), and was recently advanced to January 2027 based on ICE's request, according to Respondents' counsel at oral argument.

In June 2022, an IJ denied Petitioner release on bond. (*Id.* ¶ 11.) On October 13, 2022, and around March 1, 2023, ICE issued decisions to continue Petitioner's detention and deny release. (*Id.* ¶¶ 13, 15.) Petitioner sought a further custody redetermination hearing before an IJ based on his admission into an intensive re-entry program, Successful Treatment for Optimized Programming ("STOP"). (*Id.* ¶ 14.) On March 14, 2023, two weeks after ICE had most recently denied Petitioner's release request, an IJ granted Petitioner's release on a $5,000 bond and completion of the STOP program ("Bond Order"). (*Id.* at 13–14.) The IJ declined to order "anything else" in terms of conditions of release —including GPS tracking—because the IJ found that those would "interfere with participation" in the STOP program. (Dkt. No. 23-1 at 8–9.) Despite this order, upon release, ICE required Petitioner to wear an ankle monitor until September 2023, a condition with which Petitioner complied. (Dkt. 1-1 ¶ 18.) ICE also imposed additional reporting conditions and

a requirement that Petitioner "not commit any crimes." (Dkt. No. 10 at 3.)

Since being released, Petitioner completed the STOP program and has successfully completed his parole. (Dkt. No. 1 at 29, 32.) He lives with and helps to care for his permanent resident mother, who is recovering from neck and shoulder surgery and unable to work. (*Id.* at 61.) During her recovery, Petitioner has supported his mother financially and provided home care and transportation to medical appointments. (*Id.*) Petitioner is employed as a cabinetmaker, has participated in various fellowships, and is building a business as a tattoo artist. (Dkt. No. 1 ¶¶ 42–43.) He is also a "well-recognized leader in the immigrants' rights movement in California," "seeking to improve conditions for ICE detainees" and volunteers as a community advocate and speaker for many organizations focused on immigrant rights. (*Id.* ¶ 43–44.)

**\*3** Petitioner states that he continues to struggle with his mental health, and that his symptoms have been aggravated over the past year due in part to his fear of re-detention. (Dkt. No. 1-1 ¶ 27.) Petitioner has been receiving mental health treatment since 2022, and is seeking evaluation and placement in a more intensive treatment program. (*Id.* ¶¶ 26–27.) Petitioner was arrested on May 14, 2025. (*Id.* ¶ 28.) The police report states that Petitioner believed his ex-girlfriend had been abducted and was being held in the building where he worked as a carpenter. (Dkt. No. 7-3 at 12.) According to the police report, Petitioner went to the building and, while holding a knife, told Juan, the proprietor of another business in the building, to give him the keys to his unit. (*Id.* at 11.) Juan stated that he was not in fear of Petitioner when he gave him the keys, because Juan knew Petitioner. (*Id.*) Juan then allegedly saw Petitioner kick down the door of another unit. (*Id.*) Petitioner was arrested for robbery and vandalism, but was released the next day without any charges being filed. (Dkt. No. 1-1 ¶ 28.) Petitioner disputes that he committed a crime. (Dkt. No. 22 at 9.)

ICE learned of Petitioner's arrest and associated charges the next day, on May 15, 2025, and interviewed Petitioner soon afterwards, but did not order a police report or otherwise seek additional information about the incident at that time. (Dkt. No. 17 ¶ 7; Dkt. No. 1-1 ¶ 28.) Five weeks later, on June 23, 2025, Petitioner attended an in-person check-in with ICE, and was advised that de-escalation of his supervision would be recommended. (Dkt. No. 1-1 ¶ 29.) On the same date, ICE requested a copy of the police report relating to the arrest. (Dkt. No. 17 ¶ 10.) On June 26, 2025, Petitioner was told

to present on July 1, 2025, for a "case review" with ICE, and Petitioner's counsel was advised that Petitioner would be detained on that day. (Dkt. No. 1-1 ¶¶ 30–31.) At the time of this decision, ICE concedes that it did not have a copy of the police report, which it received the next day on June 27, 2025. (Dkt. No. 17 ¶ 10.)

Petitioner promptly filed a petition for a writ of habeas corpus on June 29, 2025, on the basis that re-detention without a hearing before a neutral decisionmaker would violate his rights to substantive and procedural due process. (Dkt. No. 1.) The same day, Petitioner moved for a temporary restraining order and preliminary injunction enjoining his re-detention without such a pre-deprivation hearing. (Dkt. No. 2.)

The motion for temporary restraining order was heard the next day June 30, 2025, and granted. (Dkt. No. 30.) At the hearing, the Court proposed to hold the preliminary injunction hearing on July 10, 2025. The government stated that it wanted more time and was willing to allow the temporary restraining order to continue for a longer period, preventing Petitioner's re-detention, in order to brief the issues on a slower timeline. The hearing was therefore set for July 14, 2025, and then extended to July 15, 2025, to permit the government additional time to file its brief, with a stipulation from the parties that good cause justified extending the temporary restraining order beyond the usual fourteen-day period under Rule 65(b)(2). (Dkt. Nos. 18–19.)

Petitioner reported for his mandatory check-in as instructed on July 1, 2025. (Dkt. No. 23 ¶ 5.) At that time, ICE placed Petitioner back on GPS monitoring. (Dkt. No. 17 ¶ 11.) On July 2, 2025, the Santa Clara County District Attorney's Office charged Petitioner with one count of vandalism, to which Petitioner intends to plead not guilty, and Petitioner remains on release in that matter. (Dkt. No. 23 ¶ 22.)

### III. LEGAL STANDARD

An injunction is a matter of equitable discretion and is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). A plaintiff seeking preliminary injunctive relief must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id.* at 20, 129 S.Ct. 365. "[I]f a plaintiff can only show that there are serious questions

going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips *sharply* in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014) (internal quotation marks and citations omitted) (emphasis in original). "[W]hen the Government is the opposing party," the final two factors "merge." *Nken v. Holder*, 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009).

### IV. ANALYSIS

#### A. Petitioner Has Raised a Serious Question Going to the Merits of His Procedural Due Process Claim

##### 1. The *Mathews* Test

**\*4** In *Mathews v. Eldridge*, the Supreme Court outlined three factors relevant for the due process inquiry: (i) the private interest, (ii) the risk of an erroneous deprivation and the value of additional procedures sought, and (iii) the government's interest, including the burdens associated with the additional procedures sought. 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). [2] Petitioner has established a serious question going to the merits under *Mathews*. He has identified a strong liberty interest in remaining on conditional release from detention, a significant risk of erroneous deprivation that can be ameliorated by providing a pre-detention hearing before a neutral arbiter, and the limited nature of the government interest in detaining Petitioner without access to a hearing.

[2]     Though the government suggests that *Mathews* should not apply, the Supreme Court, the Ninth Circuit, and its sister circuits have consistently applied the *Mathews* test to non-citizens' due process challenges, where the non-citizen has entered and been residing in the United States. *See Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206–07 (9th Cir. 2022) (collecting cases).

##### 2. Petitioner's Liberty Interest

"Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that the [due process clause] protects." *Zadvydas v. Davis*, 533 U.S. 678, 690, 121 S.Ct. 2491,

150 L.Ed.2d 653 (2001). Therefore, individuals conditionally released from detention have a protected interest in their "continued liberty." *See Young v. Harper*, 520 U.S. 143, 147, 149, 152–53, 117 S.Ct. 1148, 137 L.Ed.2d 270 (1997) (holding that a pre-parolee released to "reduce prison overcrowding" enjoy a protected liberty interest). It is well-established that the liberty interest that arises upon release is "*inherent* in the Due Process Clause." *Pruitt v. Heimgartner*, 620 F. App'x 653, 657 (10th Cir. 2015) (quoting *Boutwell v. Keating*, 399 F.3d 1203, 1212 (10th Cir. 2005)) (emphasis in *Pruitt*).

The Supreme Court has recognized this protected liberty interest even though the released individual is subject to extensive conditions of release, like reporting regularly to a parole officer, not using alcohol, and not traveling out of the country. *Young*, 520 U.S. at 148, 117 S.Ct. 1148; *see also Morrissey v. Brewer*, 408 U.S. 471, 482, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) ("[T]he liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others."); *Gagnon v. Scarpelli*, 411 U.S. 778, 782, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973) (same in the context of probation). Courts have recognized that, with the passage of time, a protectable liberty interest can "crystallize[ ]" even where an individual was released from prison in error, where the individual "reasonably thought the release was deliberate and lawful." *See Hurd v. D.C., Gov't*, 864 F.3d 671, 683–84 (D.C. Cir. 2017).

Like the individuals in *Young, Morrissey*, and *Gagnon*, Petitioner has a liberty interest in his continued release on bond. Petitioner was granted release by a neutral third-party IJ after a hearing, and has been free on bond for more than two years. He has a job, and he is an active member of the community with a strong track record of volunteering, public speaking, and other advocacy efforts. His permanent resident mother, who is recovering from surgery, relies on him financially, for assistance at home, and to attend medical appointments. While out of custody, Petitioner has obtained treatment for his diagnosed mental health conditions. Furthermore, Petitioner has completed all requirements of his criminal sentence from 2013. ICE seeks to place him in civil detention. "Given the civil context, his liberty interest is arguably greater than the interest of parolees in *Morrissey*." *See Ortega v. Bonnar*, 415 F. Supp. 3d 963, 970 (N.D. Cal. 2019) (citing *Morrissey*, 408 U.S. at 487, 92 S.Ct. 2593).

**\*5** Respondents raise three principal arguments in response. First, they argue that Petitioner has no liberty interest because his detention is mandatory under 8 U.S.C. § 1231(a)(6), and once he was released, he has been "subject to conditions of release." (Dkt. No. 15 at 13–14, 16–17.) As an initial matter, Respondents conceded at oral argument that if Petitioner is re-detained, there is no statutory or regulatory requirement mandating that he remain detained. Section 1231(a) provides that "when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days." 8 U.S.C. § 1231(a)(1)(A). During that 90-day period, detention is mandatory. *Id.* § 1231(a)(2)(A). Some individuals—such as those with certain criminal convictions—"may be detained beyond the removal period," or may be "released," "subject to supervision under regulations prescribed by the Attorney General." *Id.* § 1231(a)(3) & (6). Pursuant to a preliminary injunction entered in another case in this district, individuals detained pursuant to Section 1231(a)(6) in the Ninth Circuit are currently entitled to a bond hearing every six months. *Aleman Gonzalez v. Barr*, 955 F.3d 762, 766 (9th Cir. 2020), *rev'd and remanded on other grounds sub nom. Garland v. Aleman Gonzalez*, 596 U.S. 543, 142 S.Ct. 2057, 213 L.Ed.2d 102 (2022). Petitioner has already been detained for the "mandatory" 90-day window, and any further detention would be subject to Section 1231(a)(6) under which he "may" be released.

However, Respondents argue that Petitioner's liberty interest is still less than those of individuals subject to Section 1226(a), who have not been ordered removed and have statutory rights to bond hearings before an IJ until their removal order becomes final. (Dkt. No. 15 at 16–17.) The Ninth Circuit has rejected this argument, holding that the "liberty interests of persons detained under § 1231(a)(6) are comparable to those of persons detained under § 1226(a)." *Diouf v. Napolitano*, 634 F.3d 1081, 1086–87 (9th Cir. 2011) ("*Diouf II*") (noting that any difference would be "at the margin").[3] The court reasoned that both groups could be subject to prolonged detention, and that individuals subject to 1231(a)(6) may still seek to challenge or delay their removal, which augments their liberty interest. *Id.* Petitioner is an example of this, as he successfully jointly moved with the government to reopen his withholding of removal proceedings.

3        Although the Supreme Court rejected the Ninth Circuit's statutory interpretation in *Diouf II*, the Court declined to address *Diouf II*'s due process

analysis, which thus remains binding precedent. *See Jennings v. Rodriguez*, 583 U.S. 281, 313, 138 S.Ct. 830, 200 L.Ed.2d 122 (2018) ("we do not reach" the "constitutional arguments on their merits").

The fact that Petitioner is subject to discretionary conditions of release likewise does not mean he lacks a protectable liberty interest and can be re-detained without process. Respondents observe that, in *Zadvydas*, the Supreme Court instructed that removable non-citizens' "release may and should be conditioned on any of the various forms of supervised release that are appropriate in the circumstances, and [they] may no doubt be returned to custody upon a violation of those conditions." 533 U.S. at 700, 121 S.Ct. 2491. However, *Zadvydas* provided no instruction for what process is necessary to protect non-citizens' liberty interest when the government seeks to return them to custody. Instead, *Morrissey* and *Young* address that issue, explaining that the deprivation is a "grievous loss" that can be taken away only upon review at a hearing before a neutral arbiter, regardless of whether government agents otherwise have statutory authority to re-detain. *Morrissey*, 408 U.S. at 482, 489, 92 S.Ct. 2593; *see also Young*, 520 U.S. at 148, 117 S.Ct. 1148.

Respondents' second argument is that, because the Ninth Circuit in *Diouf II* found that requiring detainees reviewed to wait 90 days to have their initial custody determinations did "not raise serious constitutional concerns," Petitioner could not be entitled to a more prompt review. (Dkt. No. 15 at 20–21 (citing *Diouf II*, 634 F.3d at 1091).) But a released individual's interest in avoiding re-detention is different from a detainee's interest in having ongoing periodic reviews of prolonged detention. "[P]ut succinctly, revocation implicates a liberty interest that inheres in the Due Process Clause, and the denial of eligibility for [release] does not." *Pruitt*, 620 Fed. App'x. at 657. Thus, although prisoners may not have a constitutional right to be assessed for parole, parolees who have already been released have a constitutional due process right to a hearing prior to being re-incarcerated. *Cf. Jago v. Van Curen*, 454 U.S. 14, 17, 21, 102 S.Ct. 31, 70 L.Ed.2d 13 (1981) (distinguishing the liberty interests of a parolee who had *already* been released from those of a prisoner who expected to receive parole but was denied release, which were not cognizable). Likewise, even if immigration detainees must wait months before a periodic re-review of their detention, those already released on immigration bond possess an interest in their continued liberty, which grows

over time, and a due process right to a hearing before being re-detained.

**\*6** Furthermore, because Petitioner has had an individualized determination from an IJ, Petitioner is in a different position from individuals initially detained under Section 1231(a)(2)(A). It is conceivable that due process might permit a delay in assessing individuals for release when they are initially detained by ICE upon their completion of a prison sentence, due to the high probability of imminent removal and thus the presumption of their heightened potential for flight. But, even assuming that to be true, those presumptions are no longer applicable after a neutral adjudicator has performed an individualized assessment and found no flight risk or danger, and determined that removal is not imminent. Moreover, those who remained in detention since the completion of their sentences have not accrued the same substantial liberty interest as those, like Petitioner, who have been on release for years.

Respondents' third argument is that Petitioner's liberty interest is so diminished as a non-citizen that he may be detained without any meaningful process. (Dkt. No. 15 at 18–19.) "[T]he Due Process Clause applies to all 'persons' within the United States, including [non-citizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693, 121 S.Ct. 2491; *see also Hernandez v. Sessions*, 872 F.3d 976, 981 (9th Cir. 2017) ("the government's discretion to incarcerate non-citizens is always constrained by the requirements of due process"). Petitioner, who has resided in the United States since he was a child, is entitled to this constitutional protection. *Contrast Zadvydas*, 533 U.S. at 693, 121 S.Ct. 2491, *with DHS v. Thuraissigiam*, 591 U.S. 103, 138–140, 140 S.Ct. 1959, 207 L.Ed.2d 427 (2020) (holding that an individual apprehended 25 yards into U.S. territory had not "effected an entry," and his due process rights related to his expedited removal were limited to those "provided by statute"). In *Zadvydas*, an individual who had been ordered removed challenged his indefinite confinement under 8 U.S.C. § 1231(a)(6). 533 U.S. at 682, 121 S.Ct. 2491. The government argued that "whatever liberty interest [Zadvydas] possess[es], it is 'greatly diminished' by [his] lack of a legal right to live at large in this country,' " and he could be detained indefinitely. *Id.* at 696, 121 S.Ct. 2491 (citations omitted). The Supreme Court declined to so limit his due process right, finding that even though Zadvydas was detained and deportable, his liberty interest was "at the least, strong enough to raise a serious question" regarding the permissibility of detaining him indefinitely. *Id.*

Petitioner's liberty interest is even greater than Zadvydas's. Unlike Zadvydas, Petitioner was ordered released by an IJ, subject to conditions, and has been freely and openly living, working, and caring for his mother for more than two years while he awaits a final hearing on his withholding of removal application.

In the end, Respondents provide no principled reason for why Petitioner's liberty interest should be less than that of a U.S. citizen parolee or probationer. Although the Court "must weigh heavily in the balance that control over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legislature," *Rodriguez Diaz*, 53 F.4th at 1208 (quotation omitted), this is no less true in the context of a state's interest over parolees. The Supreme Court has instructed that "there is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence," *Greenholtz v. Inmates of Neb. Penal and Corr. Complex*, 442 U.S. 1, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), and if released a state has "an 'overwhelming interest' in ensuring that a parolee complies with [the conditions of parole] and is returned to prison if he fails to do so." *Pennsylvania Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 365, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998). The courts are "averse to imposing federal requirements upon the parole systems of the States." *Id.* at 369, 118 S.Ct. 2014. The *Morrissey* court acknowledged these state interests, but found that the "State has no interest in revoking parole without some informal procedural guarantees." 408 U.S. at 483, 92 S.Ct. 2593. If a parolee serving out a sentence for a violent crime, and subject to highly restrictive conditions of release, has a sufficiently strong liberty interests to be entitled to a hearing prior to re-incarceration, then a non-citizen freed from civil detention on bond likely has a similar entitlement.

**\*7** This Court has been unable to identify any other context in which government agents could permissibly take someone who had been released by a judge, lock up that person, and have no hearing either beforehand or promptly thereafter. The Court issued a notice of questions the day prior to oral argument inviting Respondents to identify any examples of a court blessing the constitutionality of such an arrangement. Respondents' counsel conceded that they could identify none. To the contrary, numerous district courts have uniformly recognized that there are, at the very least, serious questions as to whether due process requires non-citizens released by a valid order from an IJ to receive a hearing before a neutral arbiter either before or immediately after re-detention. [4] The Court has been unable to identify any court that has agreed

with Respondents' position that those non-citizens may be re-detained without any such hearing for at least six months, and Respondents have identified none.

[4]   *See, e.g., Meza v. Bonnar*, No. 18-cv-02708-BLF, 2018 WL 2554572 (N.D. Cal. June 4, 2018); *Ortega v. Bonnar*, 415 F. Supp. 3d 963 (N.D. Cal. 2019); *Vargas v. Jennings*, No. 20-cv-5785-PJH, 2020 WL 5074312 (N.D. Cal. Aug. 23, 2020); *Jorge M.F. v. Jennings*, 534 F. Supp. 3d 1050 (N.D. Cal. 2021); *Romero v. Kaiser*, No. 22-cv-02508-TSH, 2022 WL 1606294 (N.D. Cal. May 20, 2022); *Enamorado v. Kaiser*, No. 25-cv-04072-NW, 2025 WL 1382859 (N.D. Cal. May 12, 2025); *Garcia v. Bondi*, No. 25-cv-05070-JSC, 2025 WL 1676855 (N.D. Cal. Jun. 14, 2025); *Diaz v. Kaiser*, 25-cv-05071, 2025 WL 1676854 (N.D. Cal. Jun. 14, 2025); *Doe v. Becerra*, No. 25-cv-00647-DJC, —— F.Supp.3d ——, 2025 WL 691664 (E.D. Cal. Mar. 3, 2025); *Garro Pinchi v. Noem*, No. 25-cv-05632-RFL, 2025 WL 1853763 (N.D. Cal. July 4, 2025); *Singh v. Andrews*, No. 25-cv-00801, 2025 WL 1918679 (E.D. Cal. July 11, 2025); *Castanon Domingo v. Kaiser*, No. 25-cv-05893-RFL, 2025 WL 1940179 (N.D. Cal. July 14, 2025); *cf. United States v. Cisneros*, No. 19-cr-00280-RS, 2021 WL 5908407 (N.D. Cal. Dec. 14, 2021) (in the context of a motion to suppress evidence seized during an ICE arrest, finding no constitutional violation based on the entitlement to a "prompt hearing" post-arrest hearing under Section 1226(b)); *Uc v. Kaiser*, No. 22-cv-04369-CRB, 2022 WL 9496434 (N.D. Cal. Oct. 14, 2022) (denying habeas petition because the bond decision had been vacated after petitioner's release).

### 3. The Risk of Erroneous Deprivation

There is a substantial risk that Petitioner will be erroneously deprived of his liberty interest absent a pre-detention hearing before a neutral arbiter. ICE had repeatedly rejected Petitioner's requests to be released during his initial detention. Nonetheless, an IJ, who is a neutral third party, reviewed the evidence and made a factual determination after a hearing that Petitioner was not a flight risk, did not pose a danger to society, and was entitled to be released on bond. (Dkt. No. 23-1 at 9.) That determination was not appealed by ICE. Yet, Respondents take the position that notwithstanding a neutral

arbiter's determination that Petitioner should be released, ICE is entitled to unilaterally terminate the IJ's order by re-detaining Petitioner without a hearing for at least six months, based on ICE's own determination in its sole discretion that additional conditions of release unilaterally set by ICE had been violated. The risk of arbitrary or erroneous deprivation in these circumstances is undeniably stark.

Respondents argue that the post-detention administrative process described in 8 C.F.R. § 241.4 will safeguard Petitioner from the risk of erroneous deprivation. But each of those procedures is essentially no more than a request to ICE's arresting agents or their supervisors at headquarters to reconsider the agency's unilateral detention decision. Section 241.4(*l*)(1) requires notice and "an initial informal interview [with ICE] promptly" after return to custody "to respond to the reasons for revocation." There is no further description of procedural safeguards imposed by this "informal interview," nor is there any provision permitting consideration by a neutral arbiter. Three months later, ICE is required to perform a records review and interview, including an "evaluation of any contested facts." § 241.4(*l*)(3). Once again, there is no opportunity to have a neutral party evaluate ICE's unilateral determination of the contested facts. 8 C.F.R. § 241.4(h) and (k) contemplate further custody review by ICE, with the same limitations. The lack of any neutral review creates a heightened risk of deprivation for Petitioner. Indeed, when Petitioner was previously detained, he was denied bond by ICE only days before the IJ granted Petitioner the right to be released.[5]

[5]     Respondents describe Petitioner's challenge as a "facial attack" on 8 C.F.R. § 241.4(*l*). (Dkt. No. 15 at 16.) But Petitioner does not challenge Section 241.4(*l*) as unconstitutional in all applications. Instead, Petitioner challenges Respondents' ability to re-arrest him without a pre-deprivation hearing before a neutral arbiter where (i) the re-arrest would occur more two years after his release from detention by a neutral third party who determined that he was neither a flight risk nor a danger; (ii) Petitioner's detention would undisputedly last at least six months, during which he would not receive a custody redetermination hearing; (iii) Respondents have evinced a distinct lack of urgency in re-detaining Petitioner; and

(iv) Respondents have put in place additional safeguards to ensure Petitioner does not flee.

**\*8**  Additionally, Petitioner is subject to an immigration detention provision that "lack[s the] process" available under more protective schemes, such as Section 1226(a). In *Rodriguez Diaz*, the Ninth Circuit found due process satisfied in the prolonged detention context by procedural protections that were "subject to numerous levels of review, each offering [ ] the opportunity to be heard by a neutral decisionmaker." 53 F.4th at 1210. "These procedures ensured that the risk of erroneous deprivation would be 'relatively small.' " *Id.* By contrast, an individual detained under Section 1231(a)(6) has no statutory or regulatory entitlement to a bond hearing before an IJ whatsoever. Respondents offer that a preliminary injunction in another case in this district would require a bond hearing after six months. *See Aleman Gonzalez*, 955 F.3d at 766. Assuming the *Aleman Gonzalez* preliminary injunction remains in place in six months, though, it would be cold comfort for Petitioner to be re-released by an IJ after waiting six months in custody for the error to be corrected. The erroneous deprivation of liberty, along with the concomitant damage to Petitioner's mental health and impact on Petitioner's family, will have already taken place. Moreover, according to Respondents' reasoning, ICE could simply turn around the next day and re-detain Petitioner after the IJ's release, and he would be unable to have the decision reviewed by a neutral arbiter for another six months.

Magnifying the risk of erroneous deprivation, Respondents stated at oral argument that ICE may add its own conditions of release, even if rejected by the IJ at the hearing, and may re-detain unilaterally for any "change in circumstances" or any violation of those conditions. According to Respondents, it does not matter whether the change or violation materially impacts the required purposes of civil immigration detention: that is, "a threat to national security, a danger to the community at large, likely to abscond, or otherwise a poor bail risk." *In re Guerra*, 24 I. & N. Dec. 37, 40 (BIA 2006) (describing required custody re-determination factors); *see also Zadvydas*, 533 U.S. at 690, 121 S.Ct. 2491 (identifying risk of flight and danger to the community as the statutory purposes of civil immigration detention).[6] In other words, according to Respondents, ICE could re-detain those released for purely technical violations, like being one minute late to a check-in.

[6]     In their briefing, Respondents took an even more aggressive position that "re-detention here is not

subject to the 'changed circumstances' standard" at all. (Dkt. No. 15 at 14 n. 3.)

Taken to its logical extreme, this position would permit ICE to regularly re-detain individuals released by an IJ on bond over ICE's objections, pursuant to Section 1231(a)(6), even if the re-detention occurred within days of their release and without any material change in circumstances. ICE's detention decisions would then be effectively unreviewable by any neutral decisionmaker for at least six months, and if the IJ ordered the person released again, ICE could repeat the process the next day. In this alternate universe, ICE would never need to appeal a bond decision, given its unfettered authority to set additional conditions of bond and to re-detain individuals at will. That is a recipe for arbitrary and erroneous deprivations of liberty. See Zadvydas, 533 U.S. at 692, 121 S.Ct. 2491 ("The Constitution may well preclude granting 'an administrative body the unreviewable authority to make determinations implicating fundamental rights.' ") (quoting Superintendent, Mass. Correctional Institution at Walpole v. Hill, 472 U.S. 445, 450, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)).

By contrast, allowing a neutral arbiter to review the facts would significantly reduce the risk of erroneous deprivation. Respondents' representations regarding their decision to re-detain Petitioner highlight the need for such a hearing. Respondents' Opposition to the Motion argues that Petitioner violated a condition that he not "commit any crimes," a determination that Petitioner contests. (Dkt. No. 15 at 14.) Respondents state that "after reviewing the details of the police report, Officer Canning—the Deportation Office responsible for supervising Petitioner, confirmed the *presumptive determination* that re-detention was appropriate." (Dkt. No. 15 (emphasis added).) ICE did not receive the police report until June 27, but by June 26 it had made the presumptive determination and informed Petitioner's counsel that Petitioner would be re-detained. Three days earlier, however, ICE had interviewed Petitioner and then informed him that it planned to de-escalate his supervision. There is no evidence in the record of what the basis for ICE's June 26 "presumptive determination" was, or why ICE changed course after its earlier determination to de-escalate. Such unexplained and contradictory decisionmaking raises a heightened risk of erroneous deprivation of rights absent review by a neutral arbiter.

**\*9** The Supreme Court has consistently held that "the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property." *See Zinerman*,

494 U.S. at 127, 110 S.Ct. 975 (emphasis in original). Certainly, there may be situations that urgently require arrest, in which a prompt post-deprivation hearing is appropriate. *Id.* at 128, 110 S.Ct. 975 (noting there may be "special case[s]" where a pre-deprivation hearing is impracticable). However, absent evidence of urgent concerns, a *pre*-deprivation hearing is required to satisfy due process, particularly where an individual has been released on bond by an IJ. *See, e.g., Ortega*, 415 F. Supp. 3d at 970; *Vargas*, 2020 WL 5074312, at \*3–4; *Jorge M.F. v. Jennings*, 534 F. Supp. 3d 1050, 1056 (N.D. Cal. 2021).

On the record, no such urgency exists here. Respondents waited over six weeks from the incident at issue to try to arrest Petitioner. As Respondents' counsel conceded at the temporary restraining order hearing, ICE likely had the ability to obtain the police report when it learned of the arrest in mid-May. Yet, ICE did not consider it high priority. (Dkt. No. 17 ¶ 9.) Furthermore, ICE initially elected to proceed by notifying Petitioner five days in advance of their plan to arrest him at his check-in, indicating that they did not fear he would flee or refuse to comply with the requirements of his release, even with knowledge of his certain detention. Respondents' course of conduct demonstrates their lack of urgency, as does Respondents' request for an extended schedule as to this preliminary injunction motion.

### 4. The Burden on Respondents Does Not Outweigh Petitioner's Interests

Regarding the third *Mathews* factor, Respondents raise their interest in successfully removing deportable non-citizens, ensuring compliance with their orders of supervision, and protecting the public. These interests are indisputably weighty. However, in this case they do not appear to be significantly impaired by the requirement of a pre-deprivation hearing. As discussed above, two months have now passed since Petitioner's arrest and release. This delay was a result of ICE's decision to prioritize other matters. Since then, ICE has taken further steps to minimize risk of flight and ensure compliance, including requiring Petitioner to wear a GPS monitor and increasing his periodic check-ins.

Respondents submit no evidence that requiring a pre-deprivation hearing would result in a significant delay. To the contrary, Respondents conceded at the hearing that, if a court order requires a pre-deprivation hearing and ICE wishes to have the hearing take place on an expedited

Case 2:25-cv-02576-KAW Document 1-1 Filed 07/25/25 Page 24 of 51
Case 3:25-cv-03070-KAW Document 1-1 Filed 08/28/25 Page 84 of 121 PageID #: 84
Guillermo M. R. v. Kaiser, --- F.Supp.3d ---- (2025)

basis, ICE may move to advance the hearing date. At oral argument, Petitioner's counsel noted that, in her practice before the immigration courts, statutorily required bond hearings are routinely scheduled within 14 days, an estimate that Respondents did not contest. Moreover, detention remains an available option if an IJ orders it after providing Petitioner an opportunity to contest the detention and to dispute the account of the events in the police report. On this record, the additional time for a hearing does not appear to impinge on Respondents' interests.

At oral argument, Respondents characterized Petitioner's requested relief as an "unprecedented" pre-arrest bond hearing, because they argue that it is not expressly contemplated by the applicable statutory scheme and therefore there is no "regulatory or statutory authority to provide a hearing like that." However, the concept that an individual who is not subject to detention may request custody redetermination from an IJ is not novel. For example, an individual who is "released from custody" may request a hearing before an IJ within seven days to seek "amelioration of the terms of release." 8 C.F.R. § 1236.1(d)(1). Courts in this district have also regularly required pre-arrest hearings pursuant to the due process clause. *See, e.g., Ortega*, 415 F. Supp. 3d at 970; *Vargas*, 2020 WL 5074312, at *3–4; *Jorge M.F.*, 534 F. Supp. 3d at 1056. Finally, the *Aleman Gonzalez* preliminary injunction requires bond hearings in a context not expressly contemplated under the relevant statutory scheme, yet Respondents acknowledge that IJs have been successfully providing hearings pursuant to the court's order for several years. Therefore, Petitioner's request is neither unprecedented nor does it appear to present insurmountable logistical barriers.

**\*10** Respondents also express concern about the administrative costs of requiring a hearing. But Petitioner would likely need to receive such a hearing at the six-month mark anyway. Petitioner cannot be immediately deported if he is re-detained because he is awaiting a hearing on his withholding of removal application, which is currently set for January 2027. Even if the hearing were moved further forward, the undisputed record is that a final determination on the merits of the application will take a minimum of nine months. (Dkt. No. 23 ¶ 24.) Petitioner would thus likely still be in custody at the six-month mark if re-detained, and would receive a bond hearing at that time under the *Aleman Gonzalez* preliminary injunction. As such, the immigration courts would likely hear Petitioner's challenge to his re-detention either way, whether on a pre-deprivation

or post-deprivation basis, so there is no cost savings from waiting to hold the hearing. Indeed, a pre-deprivation hearing could reduce administrative costs by potentially avoiding an erroneous deprivation of liberty, which would save the costs of unnecessary detention. *See Meza v. Bonnar*, 18-cv-02708-BLF, 2018 WL 2554572, at *4 (N.D. Cal. June 4, 2018) (observing that "[t]he costs to the public of immigration detention are 'staggering' " (quoting *Hernandez*, 872 F.3d at 996)).

In sum, at the very least, Petitioner has raised a serious question going to whether the *Mathews* factors are satisfied in his favor on his procedural due process claim. [7]

[7]      Because the serious questions prong is satisfied as to Petitioner's procedural due process claim, the Court does not reach the likelihood of success as to Petitioner's substantive due process claim. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1139 (9th Cir. 2011) (declining to reach remaining claims after finding a serious question going to the merits of one claim).

**B. Petitioner Has Shown Irreparable Harm, and the Balance of Equities and Public Interest Favor an Injunction**

The likelihood of irreparable harm in this case is high. "[T]he irreparable harms imposed on anyone subject to immigration detention (or other forms of imprisonment)" are self-evident. *See Hernandez*, 872 F.3d at 995. Absent an injunction, Petitioner will be detained and will not be entitled to challenge his re-detention before a neutral adjudicator for a minimum of six months. Detention will interrupt Petitioner's ongoing mental health treatment, with potentially severe long-term consequences for him. It will interrupt Petitioner's advocacy work in the community, and Petitioner may lose his job. Petitioner will be unable to care for his mother or provide her support while she continues to recover from surgery. *See Vargas*, 2020 WL 5074312, at *4.

The balance of harms and public interest factors merge when the government is the opposing party. *Nken*, 556 U.S. at 435, 129 S.Ct. 1749. The public has an interest in the orderly and efficient administration of this country's immigration laws, but also has a strong interest "in upholding procedural protections against unlawful detention." *See Vargas*, 2020 WL 5074312, at *4 (finding the balance of hardships tipped in petitioner's favor because his detention would "subject[ ] his family to economic hardship and the loss of their caretaker").

Petitioner has demonstrated that avoiding collateral hardship to his mother, whom he supports financially and cares for, and reducing his risk of further mental health complications would serve the public interest. Further, "the general public's interest in the efficient allocation of the government's fiscal resources" is served by avoiding the cost of potential erroneous detention. *Hernandez*, 872 F.3d at 996.

Petitioner has sufficiently demonstrated serious questions going to the merits of his procedural due process claim. The balance of hardships tips sharply in his favor, as well as the *Winter* factors of likelihood of irreparable injury and public interest.

## V. ORDER

For the foregoing reasons, **IT IS HEREBY ORDERED** that Petitioner's Motion for a Preliminary Injunction is **GRANTED**. Respondents are **ENJOINED AND RESTRAINED** from re-detaining Petitioner without notice and a pre-deprivation hearing before an Immigration Judge to evaluate whether Petitioner's re-detention is warranted based on flight risk or a danger to the community. This Order shall remain in effect until further order of the Court. No security bond is required, as the government provides no evidence of costs it will incur due to Petitioner's release.

**\*11  IT IS SO ORDERED.**

**All Citations**

--- F.Supp.3d ----, 2025 WL 1983677

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   QUOC CHI HOAC,                              No. 2:25-cv-01740-DC-JDP

12                 Petitioner,

13          v.                                   ORDER GRANTING PETITIONER'S
                                                 MOTION FOR TEMPORARY
14   MOISES BECERRA, et al.,                     RESTRAINING ORDER AND MOTION FOR
                                                 PRELIMINARY INJUNCTION
15                 Respondents.
                                                 (Doc. No. 23)
16

17          This matter is before the court on Petitioner's motion for temporary restraining order and

18   motion for preliminary injunction. (Doc. No. 23). Pursuant to Local Rule 230(g), the court found

19   it appropriate to take the matter under submission to be decided on the papers. For the reasons

20   explained below, the court will grant Petitioner's motions for temporary restraining order and

21   preliminary injunction.[1]

22                                        **BACKGROUND**

23   **A.      Factual Background**

24          The court previously summarized the events that preceded the court's prior order denying

25   _____

26   [1] The court will treat Petitioner's motion for temporary restraining order and motion for
     preliminary injunction as a singular motion for preliminary injunction. The Respondents had
27   notice and an opportunity to respond. Moreover, the parties have briefed the issues extensively
     and the standard is the same. *Doe v. Becerra*, No. 25-cv-00647-DJC-DMC, 2025 WL 691664, at
28   *3 (E.D. Cal. Mar. 3, 2025).

                                                 1

1    Petitioner's initial motion for temporary restraining order. (*See* Doc. No. 21 at 1–3.) In their

2    opposition, Respondents provide a declaration from Department of Homeland Security ("DHS")

3    Deportation Officer Charles Gallenkamp. (Doc. No. 26-1.) Mr. Gallenkamp affirms in his

4    declaration that while the "travel document request for Petitioner is in the process of being

5    completed," "[a]s of July 11, 2025, there is no travel document to Petitioner's country of origin,

6    Vietnam." (*Id.* at ¶¶ 6, 7.)

7    **B.      Procedural Background**

8            On June 20, 2025, Petitioner filed a petition for writ of habeas corpus pursuant to

9    28 U.S.C. § 2241. (*Id.* at 1.) Also on June 20, 2025, Petitioner filed a motion for temporary

10   restraining order. (Doc. No. 2.) Respondents filed their opposition to Petitioner's motion for

11   temporary restraining order on June 27, 2025. (Doc. No. 18.) Petitioner filed a reply thereto on

12   June 28, 2025. (Doc. No. 19).

13           On June 30, 2025, the court held a hearing on Petitioner's motion for temporary

14   restraining order. (Doc. No. 20.) In the hearing, Petitioner was provided an opportunity to clarify

15   his request that Respondents release him from custody and refrain from re-detaining him unless

16   and until he is afforded a hearing before a neutral adjudicator. Specifically, the court asked

17   Petitioner what "neutral adjudicator" would be responsible for conducting the hearing. In

18   response, Petitioner explained that their request was to enjoin "Respondents from re-detaining

19   him unless this court first holds a hearing and makes factual findings as to whether his re-

20   detainment is warranted." (*See* Doc. No. 21 at 4.)

21           Later that day, the court issued an order denying Petitioner's motion for temporary

22   restraining order. (Doc. No. 21.) In its order, the court found Petitioner's proposed injunctive

23   relief would require the court to make the initial finding of a changed circumstance before

24   Petitioner could be re-detained. (*Id.* at 6.) The court found this form of relief was, in effect, an

25   improper intrusion on Executive Branch's authority. (*Id.* at 6–7.) The court then concluded it

26   lacked the authority to grant the relief requested, and denied Petitioner's motion on that basis

27   alone. (*Id.* at 7.)

28           Petitioner filed the operative first amended petition for writ of habeas corpus under

2

1    28 U.S.C. § 2241 alleging that he is unlawfully detained by Immigration and Customs

2    Enforcement ("ICE"), a component of the Department of Homeland Security ("DHS"). (Doc. No.

3    22 at ¶ 15.) Petitioner asserts five causes of action: (1) unlawful re-detention in violation of

4    8 C.F.R. §§ 241.13(i)(2), 1231(a)(6); (2) violation of procedures for revocation of release in

5    violation of 8 C.F.R. § 241.13(i)(3); (3) violation of the Immigration and Nationality Act of 1952

6    ("INA"); (4) unconstitutionally indefinite detention in violation of his procedural due process

7    rights under the Fifth Amendment to the United States Constitution; and (5) unconstitutionally

8    inadequate procedures regarding third country removal in violation of his procedural due process

9    rights under the Fifth Amendment to the United States Constitution. (*Id.* at 24–28.)

10       Petitioner then filed a second motion for temporary restraining order and motion for

11   preliminary injunction on July 9, 2025. (Doc. No. 23.) Respondents filed their opposition on July

12   14, 2025.[2] (Doc. No. 26.) Petitioner filed his reply thereto on July 15, 2025. (Doc. No. 27.)

13                                   **LEGAL STANDARD**

14       The standard governing the issuing of a temporary restraining order is "substantially

15   identical" to the standard for issuing a preliminary injunction. *Stuhlbarg Int'l Sales Co. v. John D.*

16   *Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). To obtain either form of injunctive relief, the

17   moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable

18   harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips

19   in favor of the moving party; and (4) that an injunction is in the public interest. *Winter v. Nat.*

20   *Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Injunctive relief is "an extraordinary remedy that

21   may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.*, 555

22   U.S. at 22.

23       A district court may consider "the parties' pleadings, declarations, affidavits, and exhibits

24

25   [2] In their opposition, Respondents move to strike and dismiss "all unlawfully named officials under § 2241." (Doc. No. 26, at 1 n.1) The proper respondent rule states that the proper

26   respondent in a "core" habeas petition challenging present physical confinement is the immediate custodian. *Doe v. Garland*, 109 F.4th 1188, 1197 (9th Cir. 2024). Petitioner has properly named

27   his immediate custodian, the Facility Administrator of the Golden State Annex. However, if Respondents seek to dismiss the other Respondents from this action, they must do so in a

28   properly noticed motion.

                                        3

1   submitted in support of and in opposition to the [motion for preliminary injunction]." *Cal. Rifle &*

2   *Pistol Ass'n, Inc. v. Los Angeles Cnty. Sheriff's Dep't*, 745 F.Supp.3d 1037, 1048 (C.D. Cal.

3   2024); *see also Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009). Any evidentiary

4   issues "properly go to weight rather than admissibility." *Am. Hotel & Lodging Ass'n v. City of Los*

5   *Angeles*, 119 F.Supp.3d 1177, 1185 (C.D. Cal. 2015).

6                                           **ANALYSIS**

7   **A.      Duplicative Motions**

8              In their opposition, Respondents argue Petitioner "unlawfully attempts to relitigate the

9   denial of their first TRO motion claims." (Doc. No. 26 at 1.) The court finds Respondents'

10  argument unpersuasive. As addressed above, the court denied Petitioner's initial motion because

11  it did not have the authority to grant the relief he requested. Specifically, the court found that

12  Petitioner's request he be released and this court be required to hold a hearing prior to any re-

13  detention was improper. (Doc. No. 21 at 5.) Subsequently, Petitioner filed an amended petition

14  and renewed motions for injunctive relief asking for relief that is substantively different from

15  what the court considered in its initial order. (Doc. Nos. 22, 23.) Accordingly, the court finds

16  Petitioner's motions are not duplicative.

17  **B.      *Winter* Factors**

18              1.      Likelihood of Success on the Merits

19              The authority of ICE to detain noncitizens under federal law derives from

20  8 U.S.C. § 1231, which directs the Attorney General of the United States to affect the removal of

21  any noncitizen from this country within 90 days of any order of removal. 8 U.S.C. § 1231(a)(1).

22  However, once that time passes and after "removal is no longer reasonably foreseeable, continued

23  detention is no longer authorized by statute," the noncitizen must be released. *Zadvydas v. Davis*,

24  533 U.S. 678, 699 (2001).

25              Upon release, a noncitizen subject to a final order of removal must comply with certain

26  conditions of release. 8 U.S.C. § 1231(a)(3), (6). The revocation of that release is governed by

27  8 C.F.R. § 241.13(i), which authorizes ICE to revoke a noncitizen's release for purposes of

28  removal. Specifically, a noncitizen's release may be revoked "if, on account of changed

1    circumstances," it is determined that "there is a significant likelihood that the [noncitizen] may be

2    removed in the reasonably foreseeable future." 8 C.F.R. § 241.13(i)(2). Upon such a

3    determination:

4           [T]he alien will be notified of the reasons for revocation of his or her
       release. The Service will conduct an initial informal interview

5           promptly after his or her return to Service custody to afford the alien
       an opportunity to respond to the reasons for revocation stated in the

6           notification. The alien may submit any evidence or information that
       he or she believes shows there is no significant likelihood he or she

7           be removed in the reasonably foreseeable future, or that he or she has
       not violated the order of supervision. The revocation custody review

8           will include an evaluation of any contested facts relevant to the
       revocation and a determination whether the facts as determined

9           warrant revocation and further denial of release.

10    *Id.* § 241.13(i)(3). The plain language of § 241.13(i)(2), does not allow a court, in the first

11    instance, to make an individualized finding that a changed circumstances has occurred. *Van*

12    *Nguyen v. Hyde*, No. 25-cv-11470-MJJ, 2025 WL 1725791, at *3 (D. Mass. Jun. 20, 2025)

13    (quoting *Kong v. United States*, 62 F.4th 608, 620 (1st Cir. 2023)). Instead, to the extent ICE

14    claims that it made such a determination, the court should review that claim in light of the factors

15    set out in 8 C.F.R. § 241.13(f), "instructing ICE on how it should make such a determination." *Id.*

16    The § 241.13(f) factors include but are not limited to:

17           [T]he history of the alien's efforts to comply with the order of
       removal, the history of the Service's efforts to remove aliens to the

18           country in question or to third countries, including the ongoing nature
       of the Service's efforts to remove this alien and the alien's assistance

19           with those efforts, the reasonably foreseeable results of those efforts,
       and the views of the Department of State regarding the prospects for

20           removal of aliens to the country or countries in question. *Id.*

21    *Id.* Respondents do not dispute that this regulation applies to this case, nor do Respondents argue

22    that compliance with this regulation is not required.

23           Petitioner has shown he is likely to succeed on his claim that Respondents did not

24    properly revoke his release pursuant to § 241.13 for the following reasons. First, in his amended

25    petition, Petitioner alleges Respondents have not timely provided him with an initial interview or

26    an opportunity to respond to the purported reasons for revocation. (Doc. No. 22 at ¶ 85.) Despite

27    having multiple opportunities to address this issue, (Doc. Nos. 18, 26), Respondents have not

28    asserted Petitioner was provided an informal interview. While at the June 30, 2025 hearing

1   Respondents claimed Petitioner was notified of the reason for his arrest at the time he was taken

2   into ICE custody, Respondents conceded they have no specific information regarding whether an

3   informal interview occurred and proffered no evidence thereof. (*See generally* Doc. Nos. 18, 20,

4   26.) Indeed, Petitioner alleged that the only reason he was given for his arrest was that he had an

5   outstanding arrest warrant, which presumably existed since he was first ordered removed by an

6   Immigration Judge in 2023. (Doc. No. 22 at ¶ 6.)

7       Government agencies are required to follow their own regulations. *United States ex rel*

8   *Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954). Because there is no indication that an

9   informal interview was provided to Petitioner, the court finds Petitioner is likely to succeed on his

10  claim that his re-detainment was unlawful. *See Wing Nuen Liu v. Carter*, No. 25-cv-03036-JWL,

11  2025 WL 1696526, at *2 (D. Kan. Jun. 17, 2025) (finding "that officials did not properly revoke

12  petitioner's release pursuant to [§] 241.13" because "and most obviously . . . petitioner was not

13  granted the required interview upon the revocation of his release"); *Sering Ceesay v. Kurzdorfer*,

14  No. 25-cv-00267-LJV, 2025 WL 1284720, at *21 (W.D. N.Y. May 2, 2025) (finding petitioner

15  was not afforded even minimal due process protections when ICE failed to provide petitioner an

16  informal interview upon his re-detainment); *Cf. Ahmad v. Whitaker*, No. 18-cv-00287-JLR-BAT,

17  2018 WL 6928540, at *5 (W.D. Wash. Dec. 4, 2018) (finding that despite not being provided an

18  informal interview, the court could not find an actionable injury because ICE had already

19  "scheduled Mr. Ahmad's removal").

20      Second, Petitioner has shown he is likely to succeed on his claim that Respondents cannot

21  demonstrate changed circumstances such that there is now a significant likelihood Petitioner will

22  be removed to Vietnam in the reasonably foreseeable future.

23      Respondents argue that due to a change in circumstances, as set forth in their prior

24  opposition, Petitioner is detained for removal in the reasonably foreseeable future. (Doc. No. 26

25  at 5.) Specifically, Respondents assert a change in circumstances exists because there is a pending

26  updated travel document request and a "2020 treaty memorandum of understanding" that

27  authorizes "removal and repatriation of Vietnamese citizens who arrived in the United States

28  before July 1995. . . ." (Doc. Nos. 18 at 5 n. 4; 20 at 5.) Additionally, Respondents assert removal

6

Case 4:25-cv-06256-KAW Document 1 Filed 07/25/25 Page 33 of 51
Case 4:25-cv-06256-KAW Document 1 Filed 07/25/25 Page 92 of 121 PageID #: 92
Case 2:25-cv-01740-DC-JDP    Document 29    Filed 07/16/25    Page 7 of 12

1    is reasonably foreseeable because removals to Vietnam have occurred recently. (Doc. No. 26 at

2    6.)

3         The fact that Respondents intend to complete a travel document request for Petitioner does

4    not make it significantly likely he will be removed in the foreseeable future. (*Id.* at 5.) Indeed,

5    Respondents represent that Petitioner was unable to be removed in 2023, "due to § 1231(a)(2)

6    concerns with travel documents." (*Id.*); *see* § 241.13(f) (factor to consider includes "nature of the

7    Service's efforts to remove this alien and the alien's assistance with those efforts, the reasonably

8    foreseeable results of those efforts"). However, Respondents have not provided any details about

9    why a travel document could not be obtained in the past, nor have they attempted to show why

10   obtaining a travel document is more likely this time around. Respondents' intent to eventually

11   complete a travel document request for Petitioner does not constitute a changed circumstance. *See*

12   *Wing Nuen Liu*, 2025 WL 1696526, at *2.

13        Likewise, Respondents rely on the "2020 treaty of memorandum of understanding" to

14   support their assertion of changed circumstances but have not provided the document for the

15   court's consideration. In *Van Nguyen*, the district court found that a 2020 Memorandum of

16   Understanding, establishing a process of review and issuance of travel documents for Vietnamese

17   citizens ordered removed, alone, was not enough to show that a changed circumstance had

18   occurred. 2025 WL 1725791, at *4. Assuming Respondents are referring to the same

19   memorandum of understanding, that assessment is not enough to show there is a significant

20   likelihood that Petitioner will be removed to Vietnam because the memorandum does not

21   mandate that Vietnam will accept Petitioner. *Id.* "Vietnam has total discretion whether to issue a

22   travel document to any individual." *Id.* Thus, the "memorandum of understanding" alone does not

23   appear to be sufficient to show a significant likelihood Petitioner may be removed in the

24   reasonably foreseeable future. *See* § 241.13(i)(2).

25        Next, Respondents' contention that Petitioner's removal is reasonably foreseeable because

26   removals to Vietnam are in fact occurring is unpersuasive. (Doc. No. 26 at 6.) In support of their

27   contention, Respondents cite to findings and recommendations issued in *Hoang Tuong Nguyen v.*

28   *Field Off. Dir., San Francisco Field Off.*, No. 24-cv-01579-KES-EPG, 2025 WL 1864885 (E.D.

1    Cal. Jun. 3, 2025). Therein, the magistrate judge recommended that a pre-1995 Vietnamese

2    immigrant's petition be denied as moot, because he the petitioner was removed from the United

3    States to Vietnam on March 19, 2025. (*Id.*)

4         However, Respondents' reliance on single case does not aid the court's analysis on

5    whether there are changed circumstances. Pre-1995 Vietnamese immigrants may be repatriated to

6    Vietnam on "a case-by-case basis." *Hoi Thanh Duong v. Tate*, No. 24-cv-04119-H, 2025 WL

7    933947, at *4 (S.D. Tex. Mar. 27, 2025) (quoting *Trinh v, Homan*, 446 F. Supp. 3d 1077, 1083

8    (C.D. Cal. 2020)). As noted above, Vietnam has discretion whether to issue a travel document to

9    any individual. The petitioner's removal to Vietnam in *Hoang Tuong Nguyen* merely

10   demonstrates that on one occasion, an individual was repatriated from the United States to

11   Vietnam. *See id.*; *Wing Nuen Liu*, 2025 WL 1696526, at *2 (finding that "a single example of

12   documentation being received in March from the Chinese Embassy for one Chinese alien is

13   hardly persuasive" to demonstrate changed circumstances).

14        Respondents have not provided the court with sufficient information that could aid the

15   court's analysis. The court finds the analysis offered in *Van Nguyen* applicable. In *Van Nguyen*,

16   the court found it was "missing some very pertinent information" including the total number of

17   requests for removal that were made to Vietnam. *Van Nguyen*, 2025 WL 1725791, at *4. The

18   court reasoned it might be able to gauge how likely it is that the petitioner would be removed to

19   Vietnam if the court knew what percentage of the requests Vietnam accepted. *Id*. For instance, the

20   court found "[i]f DHS submitted 350 requests and Vietnam issued travel documents for 328

21   individuals" then removal was significantly likely. *Id*. However, "if DHS submitted 3,500

22   requests and only 328 individuals received travel documents" the court noted "Respondents

23   would not be able to meet their burden." *Id*. Similarly, the court has no evidence regarding the

24   percentage of successful requests to Vietnam to demonstrate changed circumstances.

25        Lastly, Respondents contend Petitioner's removal to Vietnam is foreseeable because he

26   declined to apply for relief from removal and requested a removal order to Vietnam on September

27   6, 2023. (Doc. No. 26 at 5.) Respondents' contention is unavailing. Petitioner's acceptance of a

28   removal order, in itself, does not mean that Vietnam will accept a travel document for him.

1    Petitioner has shown Respondents likely did not comply provide him with the informal

2    interview as required by § 241.13(i)(3). Petitioner has also shown it is likely that there is no

3    change in circumstances such that Petitioner will be removed to Vietnam in the reasonably

4    foreseeable future as required by § 241.13(i)(2). Government agencies are required to follow their

5    own regulations, *United States ex rel Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954); *see*

6    *Waldron v. I.N.S.*, 17 F.3d 511, 518 (2d Cir. 1993) ("[W]hen a regulation is promulgated to

7    protect a fundamental right derived from the Constitution or a federal statute, and [the

8    government] fails to adhere to it, the challenged deportation proceeding is invalid.").

9    Consequently, the court concludes that Petitioner has shown a likelihood of success on the merits

10   of his claims that his re-detainment is unlawful because ICE has not complied with the controlling

11   regulations to re-detain him.

12         Therefore, this factor weighs in favor of granting Petitioner's motion for temporary

13   restraining order and preliminary injunction.

14         2.      Irreparable Harm

15         The Ninth Circuit has recognized the "irreparable harms imposed on anyone subject to

16   immigration detention" including "subpar medical and psychiatric care in ICE detention

17   facilities" and "the economic burdens imposed on detainees and their families as a result of

18   detention." *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017). Since Petitioner's release

19   from ICE custody in 2023, he has reconnected with family and obtained employment at a non-

20   profit in San Francisco. (Doc. Nos. 22 at ¶5; 23 at 30.) If Petitioner remains detained, he is at risk

21   of losing his employment and subsequently, his housing. (*Id.*)

22         Moreover, "[i]t is well established that the deprivation of constitutional rights

23   'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th

24   Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Where, as here, the "alleged

25   deprivation of a constitutional right is involved, most courts hold that no further showing of

26   irreparable injury is necessary." *Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005)

27   (quoting *Wright, Miller, & Kane, Federal Practice and Procedure*, § 2948.1 (2d ed. 2004)). The

28   Ninth Circuit has also noted that "unlawful detention certainly constitutes 'extreme or very

1   serious' damage, and that damage is not compensable in damages." *Hernandez*, 872 F.3d at 999.

2          Therefore, this factor weighs in favor of granting Petitioner's motions for temporary

3   restraining order and preliminary injunction.

4          3.    Balance of the Equities and Public Interest

5          The court now turns to the last two *Winter* factors. The balance of the equities and public

6   interest analyses merge when the government is the opposing party, as is the case in this action.

7   *See Drakes Bay Oyster Co. v. Jewell,* 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*,

8   556 U.S. 418, 435 (2009)).

9          "Just as the public has an interest in the orderly and efficient administration of this

10  country's immigration laws, [] the public has a strong interest in upholding procedural protections

11  against unlawful detention." *Vargas v. Jennings*, No. 20-cv-5785-PJH, 2020 WL 5074312, at *4

12  (N.D. Cal. Aug. 23, 2020). Petitioner has demonstrated that he is likely unlawfully detained in

13  violation of his due process rights and is suffering the harms of immigration detention. On the

14  other hand, the burden on Respondents in releasing Petitioner from detention is minimal,

15  especially considering Petitioner's compliance with the requirements of the Order of Supervision

16  ("OSUP"), his weekly attendance at ICE meetings since his release from custody in 2023, and his

17  economic and familial ties to San Francisco. (Doc. No. 22 at ¶ 5.) Despite Respondents' argument

18  to the contrary, there is nothing in the current record to suggest that releasing Petitioner would

19  impede Respondents' ability to remove him to Vietnam if the necessary travel document is

20  obtained. Further, the Ninth Circuit has recognized that "[t]he costs to the public of immigration

21  detention are 'staggering,'" and that "[s]upervised release programs cost much less by

22  comparison. . . ." *Hernandez*, 872 F.3d at 996. Government expenditure in this case is not in the

23  public interest in light of Petitioner's compliance with his OSUP, stable employment, and

24  consistent attendance at scheduled ICE meetings. *See Vargas*, 2020 WL 5074312, at *4.

25  Therefore, this factor weighs in favor of granting Petitioner's motion for temporary restraining

26  order and preliminary injunction.

27  **C.    Status Quo**

28          In his motions, Petitioner asks the court to release him from detention "to preserve the

status quo before [Respondents] unlawful actions[.]" (Doc. No. 23 at 10.) The status quo *ante litem* is "the last uncontested status which preceded the pending controversy[.]" *GoTo.com, Inc. v. Walt Disney, Co.*, 202 F.3d 1199, 1210 (9th Cir, 2000) (quoting *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963)); *see Ariz. Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1061 (9th Cir. 2014) ("the 'status quo' refers to the legally relevant relationship between the parties before the controversy arose") (citing *McCormack v. Hiedeman*, 694 F.3d 1004, 1020 (9th Cir. 2012)).

In their opposition, Respondents argue Petitioner is attempting to disturb "[t]he status quo [] this court-of-custody found in [its prior order], [] that changed circumstances warrant Petitioner's civil detention pending his reasonably foreseeable removal to Vietnam, his country of origin." (Doc. No. 26 at 6.) Respondents' characterization of this court's prior order is incorrect. The court did not address the status quo issue in its prior order. Instead, the court solely determined it lacked the authority to grant Petitioner's initial injunctive relief request. (Doc. No. 21 at 7.)

Here, Petitioner had been on supervised release for almost two years until he was re-detained by the government. (Doc. No. 22 at ¶ 5.) Because Petitioner challenges his re-detainment, the last uncontested status of Petitioner was before he was re-detained on June 4, 2025. *See Doe*, 2025 WL 691664, at *2 ("It is questionable whether that status quo is properly considered to be detention when the Government suddenly took an allegedly unconstitutional action in rearresting Petitioner without a hearing."); *Domingo-Ros v. Archambeault*, No. 25-cv-01208-DMS-DEB, 2025 WL 1425558, at * (S.D. Cal. May 18, 2025) (granting an injunction for petitioners that sought a "probationary injunction" to "preserve the status quo preceding this litigation—their physical presence in the United States free from detention"); *Abrego Garcia v. Noem*, No. 25-cv-00951-PX, 2025 WL 1014261, at *9 (D. Md. Apr. 6, 2025) (finding that the petitioner "request[ed] relief designed to re[s]tore the status quo ante . . . to return him to where he was on March 12, 2025, before he was apprehended by ICE and spirited away to [the Terrorism Confinement Center in El Salvador]"); *Pinchi v. Noem*, No. 25-cv-05632-RMI-RFL, 2025 WL 1853763, at *3 (N.D. Cal. Jul. 4, 2025) (finding that the "moment prior to the

11

1  Petitioner's likely illegal detention" is the status quo). Accordingly, the court finds Petitioner's

2  immediate release is required to return him to the status quo.

3                                   **CONCLUSION**

4        For the reasons explained above:

5        1.      Petitioner's motions for temporary restraining order and preliminary injunction

6                (Doc. No. 23) are GRANTED;

7        2.      Respondents are ORDERED to immediately release Petitioner from Respondents'

8                custody;

9        3.      Respondents are ENJOINED AND RESTRAINED from re-detaining or removing

10               Petitioner to a third country without notice and an opportunity to be heard; and

11       4.      This court will set an expedited briefing schedule on the petition for writ of habeas

12               corpus by order following the issuance of this order.

13

14       IT IS SO ORDERED.

15   Dated:   __**July 16, 2025**__

16                                                          Dena Coggins
                                                           United States District Judge
17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8                                    UNITED STATES DISTRICT COURT

9                            FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11      PHONG PHAN,                                    No. 2:25-CV-01757-DC-JDP

12                        Petitioner,

13            v.                                        ORDER GRANTING MOTION FOR
                                                       TEMPORARY RESTRAINING ORDER AND
14      MOISES BECCERRA,                               MOTION FOR PRELIMINARY
                                                       INJUNCTION
15                        Respondent.
                                                       (Doc. No. 16)
16

17

18            Petitioner Phong Phan filed an amended petition for writ of habeas corpus under 28

19      U.S.C. § 2241, alleging that he is unlawfully detained by Immigration and Customs Enforcement

20      ("ICE"), a component of the Department of Homeland Security ("DHS"). (Doc. No. 15.) This

21      matter is before the court on Petitioner Phong Phan's motion for temporary restraining order and

22      motion for preliminary injunction. (Doc. No. 16.) Pursuant to Local Rule 230(g), the court found

23      it appropriate to take the matter under submission to be decided on the papers. For the reasons

24      explained below, the court will grant Petitioner's motion for temporary restraining order and

25      preliminary injunction.[1]

26      _____
        [1] The court will treat Petitioner's motion for temporary restraining order and motion for
27      preliminary injunction as a singular motion for preliminary injunction. The Respondents had
        notice and an opportunity to respond. Moreover, the parties have briefed the issues extensively
28      and the standard is the same. *Doe v. Becerra*, No. 25-cv-00647-DJC-DMC, 2025 WL 691664, at

                                                         1

# BACKGROUND

## A.    Factual Background

The court previously summarized the events that preceded the court's prior order denying Petitioner's initial motion for temporary restraining order and motion for preliminary injunction. (*See* Doc. No. 14 at 1–4.) Since the issuance of the court's order, Respondents have filed a declaration from Charles GallenKamp, a deportation officer with ICE's Enforcement Removal Operations. (Doc. No. 19-1.) In his declaration, Mr. GallenKamp declares that as of July 11, 2025, there is no travel document to Petitioner's country of origin, Vietnam, and a "travel document request for Petitioner is in the process of being completed." (*Id.* at 19-1 at ¶¶ 5, 7.)

## B.    Procedural Background

On June 23, 2025, Petitioner filed his initial petition for writ of habeas corpus, motion for temporary restraining order, and motion for preliminary injunction. (Doc. Nos. 1, 2.) In his motions, Petitioner requested the court enter a "temporary restraining order and a preliminary injunction ordering that Respondents release him from custody and refrain from re-detaining him unless and until he is afforded a hearing before a neutral adjudicator on whether his re-detention is not indefinite, and further whether it is justified by evidence that he is a danger to the community or a flight risk." (Doc. No. 2 at 24.) On June 27, 2025, Respondents filed an opposition to Petitioner's motion. (Doc. No. 11.) On June 28, 2025, Petitioner filed a reply thereto. (Doc. No. 12.)

On June 30, 2025, the court held a hearing on Petitioner's motion. (Doc. No. 13.) In the hearing, Petitioner was provided an opportunity to clarify his request that Respondents release him from custody and refrain from re-detaining him unless and until he is afforded a hearing before a neutral adjudicator. Specifically, the court asked Petitioner what "neutral adjudicator" would be responsible for conducting the hearing. In response, Petitioner explained that their request was to enjoin "Respondents from re-detaining him unless *this court* first holds a hearing and makes factual findings as to whether his re-detainment is warranted." (Doc. No. 14 at 6)

---

*3 (E.D. Cal. Mar. 3, 2025).

2

1    (emphasis added).

2         Later that day, the court issued an order denying Petitioner's motion for temporary

3    restraining order and motion for preliminary injunction. (*Id.*) In its order, the court found

4    Petitioner's proposed injunctive relief would require the court to make the initial finding of a

5    changed circumstance before Petitioner could be re-detained. (*Id.* at 6.) The court found this form

6    of relief was, in effect, an improper intrusion on the Executive Branch's authority. (*Id.* at 6–7.)

7    The court then concluded it lacked the authority to grant the relief requested and denied

8    Petitioner's motions on that basis alone. (*Id.* at 7.)

9         On July 3, 2025, Petitioner filed the operative first amended petition for writ of habeas

10   corpus. (Doc. No. 15.) Petitioner then filed the instant motion for a temporary restraining order

11   and motion for preliminary injunction on July 9, 2025. (Doc. No. 16.) On July 15, 2025,

12   Respondents filed an opposition to Petitioner's motions.[2] (Doc. No. 19.) On July 15, 2025,

13   Petitioner filed a reply thereto. (Doc. No. 20.)

14                                  **LEGAL STANDARD**

15        The standard governing the issuing of a temporary restraining order is "substantially

16   identical" to the standard for issuing a preliminary injunction. *Stuhlbarg Int'l Sales Co. v. John D.*

17   *Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). To obtain either form of injunctive relief, the

18   moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable

19   harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips

20   in favor of the moving party; and (4) that an injunction is in the public interest. *Winter v. Nat.*

21   *Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

22        A district court may consider "the parties' pleadings, declarations, affidavits, and exhibits

23   submitted in support of and in opposition to the motion for preliminary injunction." *Cal. Rifle &*

24   _____

25   [2] In their opposition, Respondents move to strike and dismiss "all unlawfully named officials
     under § 2241." (Doc. No. 19, n. 1.) "Where an individual brings a "core" habeas petition

26   challenging present physical confinement, the immediate custodian rule states that the proper
     respondent is the immediate custodian. *Doe v. Garland*, 109 F.4th 1188, 1197 (9th Cir. 2024).

27   Petitioner has properly named their immediate custodian, the Facility Administrator of the Golden
     State Annex. However, if Respondents seek to dismiss the other Respondents from this action,

28   they must do so in a properly noticed motion.

                                        3

1    *Pistol Ass'n, Inc. v. Los Angeles Cnty. Sheriff's Dep't,*, 745 F.Supp.3d 1037, 1048 (C.D. Cal.

2    2024); *see also Johnson v. Couturie*r, 572 F.3d 1067, 1083 (9th Cir. 2009). Injunctive relief is "an

3    extraordinary remedy that may only be awarded upon a clear showing that plaintiff is entitled to

4    such relief." *Winter*, 555 U.S. at 22.

5    **DISCUSSION**

6    **A. Petitioner's Motions are not Duplicative**

7    In their opposition, Respondents argue Petitioner "unlawfully attempts to relitigate the

8    denial of their first [injunctive] motions. (Doc. No. 19 at 1.) The court finds Respondents

9    argument unpersuasive. As addressed above, the court denied Petitioner's initial motions because

10   it did not have the authority to grant the relief he requested. Specifically, the court found that

11   Petitioner's request he be released and this court be required to hold a hearing prior to any re-

12   detention was improper. (Doc. No. 14 at 5.) Subsequently, Petitioner has filed an amended

13   petition and motions for injunctive relief asking for relief that is substantively different from what

14   the court considered in its initial order. Accordingly, the court finds Petitioner's motions are not

15   duplicative.

16   **B. Likelihood of Success on the Merits**

17   The authority of ICE to detain noncitizens under federal law derives from 8 U.S.C. §

18   1231, which directs the Attorney General of the United States to affect the removal of any

19   noncitizen from this country within 90 days of any order of removal. 8 U.S.C. §1231(a)(1).

20   However, once that time passes and after "removal is no longer reasonably foreseeable, continued

21   detention is no longer authorized by statute", the noncitizen must be released. *Zadvydas v. Davis*,

22   533 U.S. 678, 699 (2001). Upon release, a noncitizen subject to a final order of removal must

23   comply with certain conditions of release. 8 U.SC. § 1231(a)(3), (6). The revocation of that

24   release is governed by 8 C.F.R. § 241.13(i), which authorizes ICE to revoke a noncitizen's release

25   for purposes of removal. Specifically, a noncitizen's release may be revoked "if, on account of

26   changed circumstances," it is determined that "there is a significant likelihood that the

27   [noncitizen] may be removed in the reasonably foreseeable future." 8 C.F.R. § 241.13(i)(2). Upon

28   such a determination:

Case 2:25-cv-06254-KAW Document 11 Filed 07/25/25 Page 44 of 51
Case 4:25-cv-06254-KAW Document 11 Filed 07/25/25 Page 102 of 121 PageID #: 102
Case 2:25-cv-01757-DC-JDP     Document 22     Filed 07/16/25     Page 5 of 12

> [T]he alien will be notified of the reasons for revocation of his or her release. The Service will conduct an initial informal interview promptly after his or her return to Service custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification. The alien may submit any evidence or information that he or she believes shows there is no significant likelihood he or she be removed in the reasonably foreseeable future, or that he or she has not violated the order of supervision. The revocation custody review will include an evaluation of any contested facts relevant to the revocation and a determination whether the facts as determined warrant revocation and further denial of release.

*Id.* § 241.13(i)(3). The plain langue of § 241.13(i)(2), does not allow a court, in the first instance, to make an individualized finding that a changed circumstances has occurred. *Van Nguyen v. Hyde*, No. 25-cv-11470-MJJ, 2025 WL 1725791, at *3 (D. Mass. Jun. 20, 2025) (quoting *Kong v. United States*, 62 F.4th 608, 620 (1st Cir. 2023)). Instead, to the extent ICE claims that it made such a determination, the court should review that claim in light of the factors set out in 8 C.F.R. § 241.13(f), "instructing ICE on how it should make such a determination." *Id.* The § 241.13(f) factors include but are not limited to:

> [T]he history of the alien's efforts to comply with the order of removal, the history of the Service's efforts to remove aliens to the country in question or to third countries, including the ongoing nature of the Service's efforts to remove this alien and the alien's assistance with those efforts, the reasonably foreseeable results of those efforts, and the views of the Department of State regarding the prospects for removal of aliens to the country or countries in question.

*Id.* Respondents do not dispute that the above regulations apply to this case, nor do Respondents argue that compliance with these regulations are not required.

Petitioner has shown he is likely to succeed on his claim that Respondents did not properly revoke Petitioner's release pursuant to § 241.13, for the following reasons. First, in his amended petition, Petitioner alleges Respondents have not timely provided him with an initial interview or an opportunity to respond to the purported reasons for revocation. (Doc. No. 15 at ¶ 85.) Despite having multiple opportunities to address this issue, (Doc. Nos. 11, 19), Respondents have not provided any evidence that Petitioner was provided an informal interview. While at the June 30, 2025, hearing Respondents claimed Petitioner was notified of the reason for his arrest at the time he was taken into ICE custody, Respondents conceded they have no specific information regarding whether an informal interview occurred and proffered no evidence thereof. (*See*

1   *generally* Doc. Nos. 11, 13, 19.) Indeed, Petitioner alleged that the only reason he was given for

2   his arrest was that he had an outstanding arrest warrant, which presumably existed since he was

3   first ordered removed by an Immigration Judge in 2021. (Doc. No. 15 at ¶ 33.)

4          Because there is no indication that an informal interview was provided to Petitioner, the

5   court finds Petitioner is likely to succeed on his claim that his re-detainment was unlawful. *See*

6   *Wing Nuen Liu v. Carter*, No. 25-cv-03036-JWL, 2025 WL 1696526, at *2 (D. Kan. Jun. 17,

7   2025) (finding "that officials did not properly revoke petitioner's release pursuant to [§] 241.13"

8   because "and most obviously . . . petitioner was not granted the required interview upon the

9   revocation of his release"); *Sering Ceesay v. Kurzdorfer*, No. 25-cv-00267-LJV, 2025 WL

10  1284720, at *21 (W.D. N.Y. May 2, 2025) (finding petitioner was not afforded even minimal due

11  process protections when ICE failed to provide petitioner an informal interview upon his re-

12  detainment); *Cf. Ahmad v. Whitaker*, No. 18-cv-00287-JLR-BAT, 2018 WL 6928540, at *5

13  (W.D. Wash. Dec. 4, 2018) (finding that despite not being provided an informal interview, the

14  court could not find an actionable injury because ICE had already "scheduled Mr. Ahmad's

15  removal"); *see also Roe v. Oddo*, No. 25-cv-00128, 2025 WL 1892445, at *8 (W.D. Pa. Jul. 9,

16  2025) (finding ICE had provided notice and informal interview, and consequently, had complied

17  with the applicable laws).

18         Second, Petitioner has shown he is likely to succeed on his claim that Respondents cannot

19  demonstrate a changed circumstances such that there is now a significant likelihood Petitioner

20  will be removed to Vietnam in the reasonably foreseeable future.

21         Respondents argue that due to a change in circumstances, as set forth in their prior

22  opposition, Petitioner is detained for removal in the reasonably foreseeable future. (Doc. No. 19

23  at 5.) Specifically, Respondents argue that due to "an updated executive branch assessment

24  indicating likelihood of removal, there is now [a] high probability Petitioner will be removed in

25  the reasonably foreseeable future[.]" (Doc. No. 11 at 4.) Respondents have not provided this

26  "updated executive branch assessment" to the court, so the court is unable to consider its contents

27  for purposes of this motion.

28         Next, Respondents contention that Petitioner's removal is reasonably foreseeable because

1    removals to Vietnam are in fact occurring is unpersuasive. (Doc. No. 19 at 6.) In support of their

2    contention, Respondents cite to findings and recommendations issued in *Hoang Tuong Nguyen v.*

3    *Field Off. Dir., San Francisco Field Off.*, No. 24-cv-01579-KES-EPG, 2025 WL 1864885 (E.D.

4    Cal. Jun. 3, 2025). Therein, the magistrate judge recommended that a pre-1995 Vietnamese

5    immigrant's petition be denied as moot, because he the petitioner was removed from the United

6    States to Vietnam on March 19, 2025. (*Id.*)

7         However, Respondents reliance on a single case, *Hoang Tuong Nguyen*, does not aid the

8    court's analysis on whether there are changed circumstances. Pre-1995 Vietnamese immigrants

9    may be repatriated to Vietnam on "a case-by-case basis." *Hoi Thanh Duong v. Tate*, No. 24-cv-

10   04119-H, 2025 WL 933947, at *4 (S.D. Tex. Mar. 27, 2025) (quoting *Trinh v, Homan*, 446 F.

11   Supp. 3d 1077, 1083 (C.D. Cal. 2020)). As noted above, Vietnam has discretion whether to issue

12   a travel document to any individual. The petitioner's removal to Vietnam in *Hoang Tuong*

13   *Nguyen* merely demonstrates that on one occasion, an individual was repatriated from the United

14   States to Vietnam. *Cf. Wing Nuen Liu*, 2025 WL 1696526, at *2 (finding that "a single example

15   of documentation being received in March from the Chinese Embassy for one Chinese alien is

16   hardly persuasive" to demonstrate changed circumstances).

17        Respondents have not provided the court with sufficient information that could aid the

18   court's analysis on the foreseeability of removal to Vietnam. The court finds the analysis offered

19   in *Van Nguyen* applicable. In *Van Nguyen*, the court found it was "missing some very pertinent

20   information" including the total number of requests for removal that were made to Vietnam. *Van*

21   *Nguyen*, 2025 WL 1725791, at *4. The court reasoned it might be able to gauge how likely it is

22   that the petitioner would be removed to Vietnam if the court knew what percentage of the

23   requests Vietnam accepted. *Id.* For instance, the court found "[i]f DHS submitted 350 requests

24   and Vietnam issued travel documents for 328 individuals" then removal was significantly likely.

25   *Id.* However, "if DHS submitted 3,500 requests and only 328 individuals received travel

26   documents" the court noted "Respondents would not be able to meet their burden." *Id.* Similarly,

27   the court has no evidence regarding the percentage of successful requests to Vietnam to

28   demonstrate changed circumstances.

1      As to Respondents' assertion of a pending updated travel document request, Respondents

2  intent to complete a travel document request for Petitioner does not make it significantly likely he

3  will be removed in the foreseeable future. (Doc. No. 19 at 5.) Indeed, Respondents represent that

4  Petitioner was unable to be removed in 2021, "due to § 1231(a)(2) concerns with travel

5  documents." (*Id.*); *see* § 241.13(f) (factor to consider includes "nature of the Service's efforts to

6  remove this alien and the alien's assistance with those efforts, the reasonably foreseeable results

7  of those efforts"). However, Respondents have not provided any details about why a travel

8  document could not be obtained in the past, nor have they attempted to show why obtaining a

9  travel document is more likely this time around. Respondents' intent to eventually complete a

10  travel document request for Petitioner does not constitute a changed circumstance. *See Wing*

11  *Nuen Liu*, 2025 WL 1696526, at *2.

12      Lastly, Respondents contend Petitioner's removal to Vietnam is foreseeable because he

13  declined to apply for relief from removal and requested a removal order to Vietnam on May 4,

14  2021. (Doc. No. 19 at 5.) Respondents' contention is unavailing. Petitioner's acceptance of a

15  removal order, in itself, does not mean that Vietnam will accept a travel document for him.

16      Here, Petitioner has shown that Respondents likely did not provide him with an informal

17  interview as required by § 241.13(i)(3). Petitioner has also shown it is likely that there is no

18  change in circumstances such that Petitioner will be removed to Vietnam in the reasonably

19  foreseeable future as required by § 241.13(i)(2). Government agencies are required to follow their

20  own regulations, *United States ex rel Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954); *see*

21  *Waldron v. I.N.S.*, 17 F.3d 511, 518 (2d Cir. 1993) ("[W]hen a regulation is promulgated to

22  protect a fundamental right derived from the Constitution or a federal statute, and [the

23  government] fails to adhere to it, the challenged deportation proceeding is invalid."").

24  Consequently, the court concludes that Petitioner has shown a likelihood of success on the merits

25  of his claims that his re-detainment is unlawful because ICE had not complied with the

26  controlling regulations to re-detain him.

27      Therefore, this factor weighs in favor of granting Petitioner's motion for temporary

28  restraining order and preliminary injunction.

8

**C. Irreparable Harm**

The Ninth Circuit has recognized the "irreparable harms imposed on anyone subject to immigration detention" including "subpar medical and psychiatric care in ICE detention facilities" and "the economic burdens imposed on detainees and their families as a result of detention." *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017). Since Petitioner's release from ICE custody in 2021, he has reconnected with family and obtained employment at a non-profit in San Francisco. (Doc. No. 16 at 30.) If Petitioner remains detained, he is at risk of losing his employment and subsequently, his housing. (*Id.*)

Further, "[i]t is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Where, as here, the "alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005) (quoting Wright, Miller, & Kane, Federal Practice and Procedure, § 2948.1 (2d ed. 2004)). The Ninth Circuit has also noted that "unlawful detention certainly constitutes 'extreme or very serious' damage, and that damage is not compensable in damages." *Hernandez*, 872 F.3d at 999.

Therefore, this factor weighs in favor of granting Petitioner's motion for temporary restraining order and preliminary injunction.

**D. Balance of the Equities and Public Interest**

The court now turns to the last two *Winter* factors. The balance of the equities and public interest analyses merge when the government is the opposing party, as is the case in this action. *See Drakes Bay Oyster Co. v. Jewell,* 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

"Just as the public has an interest in the orderly and efficient administration of this country's immigration laws, [] the public has a strong interest in upholding procedural protections against unlawful detention." *Vargas v. Jennings*, No. 20-cv-5785-PJH, 2020 WL 5074312, at *4 (N.D. Cal. Aug. 23, 2020) (internal quotation omitted). Petitioner has demonstrated that he is likely unlawfully detained in violation of his due process rights and is suffering the harms of

9

1  immigration detention. On the other hand, the burden on Respondents in releasing Petitioner from

2  detention is minimal, especially considering Petitioner's compliance with the requirements of the

3  Order of Supervision ("OSUP"), his weekly attendance at his ICE meetings since his release from

4  custody in 2021, and his economic and familial ties to San Francisco. (Doc. No. 16 at 12.)

5      Despite Respondents' argument to the contrary, there is nothing in the current record to

6  suggest that releasing Petitioner would impede Respondents' ability to remove him if the

7  necessary travel documents is obtained. Further, the Ninth Circuit has recognized that "[t]he costs

8  to the public of immigration detention are 'staggering,'" and that "[s]upervised release programs

9  cost much less by comparison. . . ." *Hernandez*, 872 F.3d at 996. Government expenditure in this

10  case is not in the public interest in light of Petitioner's compliance with his OSUP, stable

11  employment, and consistent attendance at scheduled ICE meetings. *See Vargas v. Jennings,* 2020

12  WL 5074312, at *4. Therefore, the court finds that all four *Winter* factors weigh in favor of

13  Petitioner.

14     **E. Status Quo**

15      In his motions, Petitioner asks the court to release him from detention "to preserve the

16  status quo before [Respondents] unlawful actions[.]" (Doc. No. 16 at 10.) The status quo *ante*

17  *litem* is "the last uncontested status which preceded the pending controversy[.]" *GoTo.com, Inc. v.*

18  *Walt Disney, Co.*, 202 F.3d 1199, 1210 (9th Cir, 2000) (quoting *Tanner Motor Livery, Ltd. v.*

19  *Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963)); *see Ariz. Dream Act Coalition v. Brewer*, 757 F.3d

20  1053, 1061 (9th Cir. 2014) ("the 'status quo' refers to the legally relevant relationship between

21  the parties before the controversy arose.") (citing *McCormack v. Hiedeman*, 694 F.3d 1004, 1020

22  (9th Cir. 2012)).

23      In their opposition, Respondents argue Petitioner is attempting to disturb "[t]he status quo

24  [] this court-of-custody found in [its prior order], [] that changed circumstances warrant

25  Petitioner's civil detention pending his reasonably foreseeable removal to Vietnam, his country of

26  origin." (Doc. No. 19 at 7.) Respondents' characterization of its prior order is incorrect. The court

27  did not address the status quo in its prior order.

28      Here, Petitioner had been on supervised release for almost four years until he was re-

1    detained by the government. (Doc. No. 15 at ¶¶ 34, 36.) Because Petitioner challenges his re-

2    detainment, the last uncontested status of Petitioner was before he was re-detained on June 3,

3    2025. *See Doe*, 2025 WL 691664, at *2 ("It is questionable whether that status quo is properly

4    considered to be detention when the Government suddenly took an allegedly unconstitutional

5    action in rearresting Petitioner without a hearing."); *Domingo-Ros v. Archambeault*, No. 25-cv-

6    01208-DMS-DEB, 2025 WL 1425558, at * (S.D. Cal. May 18, 2025) (granting an injunction for

7    petitioners that sought a "probationary injunction" to "preserve the status quo preceding this

8    litigation—their physical presence in the United States free from detention"); *Abrego Garcia v.*

9    *Noem*, No. 25-cv-00951-PX, 2025 WL 1014261, at *9 (D. Md. Apr. 6, 2025) (finding that the

10   petitioner "request[ed] relief designed to re[s]tore the status quo ante . . . to return him to where

11   he was on March 12, 2025, before he was apprehended by ICE and spirited away to [the

12   Terrorism Confinement Center in El Salvador]"); *Pinchi v. Noem*, No. 25-cv-05632-RMI-RFL,

13   2025 WL 1853763, at *3 (N.D. Cal. Jul. 4, 2025) (finding that the "moment prior to the

14   Petitioner's likely illegal detention" is the status quo). Accordingly, the court finds Petitioner's

15   immediate release is required to return him to the status quo.

16                                     **CONCLUSION**

17       For the reasons explained above,

18   1.    Plaintiff's motions for temporary restraining order and preliminary

19         injunction  (Doc. No. 16) are GRANTED;

20   2.    Respondents are ORDERED to immediately release Petitioner from Respondents'

21         custody; and

22   3.    Respondents are ENJOINED AND RESTRAINED from re-detaining or removing

23         Petitioner to a third country without notice and an opportunity to be heard; and

24   /////

25   /////

26   /////

27   /////

28   /////

4.      This court will set an expedited briefing schedule on the petition for writ of habeas corpus by order following the issuance of this order.


IT IS SO ORDERED.

Dated:    **July 16, 2025**

Dena Coggins
United States District Judge

12

Exhibit H

Case 1:25-cv-10676-BEM   Document 124-1   Filed 07/30/25   Page 53 of 53
Case 4:25-cv-06654-BEW   Document 43-1   Filed 08/28/25   Page 111 of 121   PageID #: 111

54a

MEMORANDUM FOR:    Kika Scott
                   Senior Official Performing the Duties of the Director
                   U.S. Citizenship and Immigration Services

                   Pete R. Flores
                   Senior Official Performing the Duties of the Commissioner
                   U.S. Customs and Border Protection

                   Todd Lyons
                   Acting Director
                   U.S. Immigration and Customs Enforcement

FROM:              Kristi Noem
                   Secretary of Homeland Security

SUBJECT:           **Guidance Regarding Third Country Removals**

**Purpose**

This memorandum clarifies DHS policy regarding the removal of aliens with final orders of removal pursuant to sections 240, 241(a)(5), or 238(b) of the Immigration and Nationality Act (INA) to countries other than those designated for removal in those removal orders (third country removals).[1] DHS has used similar processes before, including with respect to Title 42 expulsions and the Migrant Protection Protocols.

**Process Regarding Third Country Removals[2]**

*Written Notice to the Alien & Fear Screening*

Prior to the alien's removal to a country that had not previously been designated as the country of removal, DHS must determine whether that country has provided diplomatic assurances that aliens removed from the United States will not be persecuted or tortured. If the United States has received such assurances, and if the Department of State believes those assurances to be credible, the alien

---

[1] This memorandum does not address expedited removals pursuant to INA § 235(b)(1).

[2] These procedures only apply to aliens who have no ongoing proceeding in which to raise a claim under INA § 241(b)(3) or the Convention Against Torture. For aliens who have such proceedings, DHS will follow existing procedures.

may be removed without the need for further procedures. If the United States has not received those assurances, or if the Department of State does not believe them to be credible, DHS must follow the procedures below.

DHS will first inform the alien of removal to that country. Immigration officers will not affirmatively ask whether the alien is afraid of being removed to that country. DHS is taking this approach in line with its determination in mid-2024 that such questioning may be suggestive and that asking them leads to false claims rendering the immigration system as a whole less efficient. *Securing the Border*, 89 Fed. Reg. 48710, 48743 (June 7, 2024) (noting that aliens are "more likely to respond in the affirmative, even if they do not in fact have a fear of return or intention of seeking asylum" when asked affirmative fear questions); *Securing the Border*, 89 Fed. Reg. 81156, 81235 (Oct. 7, 2024). The allegation that a foreign country's government will torture an alien or allow an alien to be persecuted, particularly a government with which the United States has a diplomatic relationship, is a serious one. It is not unreasonable for an alien in that circumstance to be expected to affirmatively express a fear of persecution or torture.

Immigration officers will refer any alien who affirmatively states a fear of removal to U.S. Citizenship and Immigration Services (USCIS) for a screening for eligibility for protection under INA § 241(b)(3) and the Convention Against Torture (CAT) for the country of removal.

### Where the Alien Affirmatively States a Fear

In cases where the alien affirmatively states a fear, USCIS will generally screen the alien within 24 hours of referral from the immigration officer. This screening may be done remotely. USCIS will determine whether the alien would more likely than not be persecuted on a statutorily protected ground or tortured in the country of removal. If USCIS determines that the alien has not met this standard, the alien will be removed.

If USCIS determines that the alien has met this standard and the alien was not previously in proceedings before the Immigration Court, USCIS will refer the matter to the Immigration Court in the first instance. In cases where the alien was previously in proceedings before the Immigration Court, USCIS will notify the referring immigration officer of its finding, and the immigration officer will inform U.S. Immigration and Customs Enforcement (ICE). ICE OPLA may file a motion to reopen with the Immigration Court or the Board of Immigration Appeals, as appropriate, for further proceedings for the sole purpose of determining eligibility for protection under INA § 241(b)(3) and CAT for the country of removal. Alternatively, ICE may choose to designate another country for removal.

Exhibit I

Good morning,

Thank you for your inquiry.

Please Report in Person at 26 Federal Plaza 1st Floor Room 102 New York 10278 on August 07, 2025, at 8:00 am.

Please bring all immigration documents, valid passport, and appointment notice printed.

If you have any questions, please send an email to ERONYCAppointments@ice.dhs.gov.

Respectfully,

V.Adames

Associate

ICE/ERO NYC

26 Federal Plaza 9th FLR

New York City, NY 10278

**From:** Vadim Pavlotskiy <vadim.pavlotskiy@gmail.com>
**Sent:** Tuesday, July 29, 2025 11:15 AM
**To:** ERONYCAPPOINTMENTS, <ERONYCAPPOINTMENTS@ice.dhs.gov>
**Subject:** Check-In Date Request (A071 078 382)

---

**CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

[Quoted text hidden]

 **FOAS Appointment Confirmation - Pavlotskiy, Vadim.pdf**
70K

# Appointment Confirmed:

## Thursday, August 7, 2025 08:00AM (EST)

## Confirmation # FOAS1370310

#### Please keep this confirmation number for your records.

**Selected Location:**

**NEW YORK FIELD OFFICE (NYC)**
26 FEDERAL PLAZA
NEW YORK, NY 10278

📞 212-436-9315

✉ ERONYCAPPOINTMENTS@ice.dhs.gov

**Appointment Information:**

👤 Name: **PAVLOTSKIY, VADIM**

🔖 Alien Number: **071078382**

🔖 Subject ID: **265653519**

🔖 Case ID: **8279999**

ⓘ Appointment Type: **Non-Detained Single**

**Site Directions:**

**Family Units, please report to 26 Federal Plaza, 5th Floor, Room 537C at your scheduled appointment time with all members of your immediate family. Bring with you, original documents to confirm proof of citizenship (passport, birth certificate, cedula). Also bring with you, proof of address (must reside in New York Area of Responsibility) and a valid cell phone number.**

**All others, please report to room 102 in the lobby at your scheduled appointment time.**

**Preséntese en 26 Federal Plaza, 5th Floor, Room 537C a la hora programada para su cita con todos los miembros de su familia inmediata. Lleve consigo los documentos originales para confirmar la prueba de ciudadanía (pasaporte, certificado de nacimiento, cédula). También traiga consigo un comprobante de domicilio (debe residir en el Área de responsabilidad de Nueva York) y un número de teléfono celular válido.**

**Todos los demas, presentense a la sala 102 a la hora programada para su cita.**

**Site Instructions:**

**When scheduling an appointment, please provide a phone number and/or an email address so that we may communicate any changes in your appointment if the need arises.**

**Please bring your identification documents and all paperwork issued upon release.**

Al programar una cita, proporcione un número de teléfono y/o una dirección de correo electrónico para que podamos comunicarle cualquier cambio en su cita si surge la necesidad.

Traiga sus documentos de identificación y todos los documentos emitidos al momento de la liberación.

Exhibit J

**Maimonides Midwood Community Hospital**
**2525 Kings Highway Brooklyn, NY 11229**
**T: 718-692-5300 / F: 718-692-5788**

Maimonides

PAVLOTSKIY, VADIM
Acc #:421695328 MRN:678833
DOB: 04/28/1972 Age:53 Y. Sex: M
Location: ED — Type: E
Dr:Walling, To Be Seen

DATE: _8/7/ 2025_

To whom it may concern:

_Pavlotskiy, Vadim_ was treated at the Maimonides Midwood Community
(Patient Name)

Hospital's Emergency Services Department and was advised to follow the following orders:

|  | Date | | Date |
|---|---|---|---|
| ☐ Bed Rest | _____ | to | _____ |
| ☐ No Heavy Lifting | _____ | to | _____ |
| ☐ Limited Activities | _____ | to | _____ |
| ☐ Use school/work elevator | _____ | to | _____ |

Thank you,

_David PA-C_

Emergency Services Physician Signature

Exhibit K

 Gmail

Vadim Pavlotskiy <vadim.pavlotskiy@gmail.com>

---

**Pavlotskiy, Vadim (A071 078 382)**
1 message

---

**Zhannetta Arinicheva** <zhannetta.fnp@gmail.com>                    Thu, Aug 7, 2025 at 10:19 AM
To: ERONYCAPPOINTMENTS@ice.dhs.gov
Cc: "vadim.pavlotskiy@gmail.com" <vadim.pavlotskiy@gmail.com>

My name is Zhannetta Pavlotskiy, and my husband, Vadim Pavlotskiy, was scheduled for a check-in this morning at 8:00AM at 26 Fed. Plaza. Unfortunately, due to an extensive heart condition, he was checked into the emergency room at Maimonides Hospital overnight. As of the time of this email, it is still unknown to what extent he will require medical treatment and the length of the necessary treatment. I respectfully request on his behalf that his appointment be rescheduled with sufficient time for him to recover. Please see attached photos and letter from the Emergency Room Physician.

Sincerely,

Zhannetta Pavlotskiy

---

**3 attachments**



**Pic 2.jpg**
169K



**Pic 1.jpg**
157K

**Letter from IZ.pdf**
159K

# United State District Court

## Eastern District of New York

VADIM PAVLOTSKIY,

Petitioner-Plaintiff,

-against-

WILLIAM JOYCE, Acting Field Office Director of the New York Immigration and Customs Enforcement Office,

TODD LYONS, Acting Director of United States Immigration and Customs Enforcement,

KRISTI NOEM, Secretary of the United States Department of Homeland Security,

PAM BONDI, Attorney General of the United States

Respondents-Defendants.

## PETITION FOR WRIT OF HABEAS CORPUS
## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**JOHN P. STEBE, ESQ.**
3514 Campfire Rd.
Yorktown Heights, NY 10598
Tel (718) 490-7130
Email: StebeLaw@yahoo.com